STATE OF CONNECTICUT *v.* ANTHONY AZUKAS
(SC 17163)

Borden, Norcott, Katz, Palmer and Zarella, Js.

Argued January 9—officially released May 23, 2006

*Christopher Herrick* and *Donald Dinsmore*, certified law student interns, with whom was *Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Jessica Probolus*, special deputy assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Robin Lipsky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The defendant, Anthony Azukas, appeals[1] from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a). The defendant claims that the trial court improperly denied his motion to suppress certain statements that he had made to the police because: (1) the police made an illegal warrantless entry into the defendant's bedroom; and (2) the defendant never waived his right against self-incrimination and provided his statements as a result of police coercion. We affirm the judgment of the trial court.

The defendant was charged with the murder of the victim, Scott Mascia, in violation of § 53a-54a (a). Prior to trial, the defendant moved to suppress any oral and

---

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

written statements that he had made to the police, as well as any evidence to which he had directed them subsequent to his arrest. After an evidentiary hearing, the trial court denied the defendant's motion in its entirety. Following the jury's guilty verdict, the court rendered judgment in accordance with the verdict and sentenced the defendant to the maximum penalty of life imprisonment.[2] This appeal followed.

The jury reasonably could have found the following facts. On the evening of January 26, 1998, the defendant and three friends, Christopher Foody, Maria Bologna, and Jason Gray, were driving in Foody's car on Cooke Street in Waterbury. Foody was driving, the defendant was seated in the front passenger seat, Gray was seated behind the defendant and Bologna was seated behind Foody. While driving in the neighborhood of Cooke Street, Foody took out a handgun, and he and Gray took turns shooting at street signs and parked cars. After reloading the gun from a box of bullets that he had with him, Gray passed the weapon to the defendant. Foody then pulled up behind the victim's vehicle, which was stopped at a red light on Cooke Street. As the light changed, the victim made a left turn onto Moran Street, and Foody pulled into the oncoming traffic lane and tried to speed past the victim's car on the wrong side of the road. As the cars were next to each other, the defendant pointed the gun at the victim and fired four shots at him from approximately four feet away, resulting in the victim's death.

On the day following the shooting, the defendant buried the weapon in the bushes alongside his house, but fearing that the gun still could be discovered, the defendant and Gray thereafter retrieved the weapon, filed off the serial numbers, dismantled it and then

---

[2] Pursuant to General Statutes § 53a-35b, a "sentence of imprisonment for life shall mean a definite sentence of sixty years" imprisonment.

threw the pieces into Lakewood Lake. On the night of the shooting, the defendant and Gray also discarded the spent shell casings from the gun into a river located close to the defendant's house.

Upon their arrival at the crime scene on the night of the shooting, the Waterbury police department began an extensive investigation into the victim's murder, but the case remained unsolved for four years. On the fourth anniversary of the victim's death, newspaper and television segments publicized the incident, and a reward was offered for any information that might help solve the crime. A short time later, the police received information that the defendant, Foody, Gray and Bologna were all involved in the shooting. Subsequently, Foody, Bologna and Gray gave statements to the police that they were with the defendant on the night of January 26, 1998, and had witnessed him shoot the victim.

On February 22, 2002, the police learned that the defendant was staying with his girlfriend, Jennifer Czerna, and their infant child, at a house located at 200 Wakefield Circle in East Hartford, which was owned by his girlfriend's father, William Czerna (Czerna). The following morning, Sergeant Gary Pelosi and Lieutenant Scott O'Connor, as well as several other members of the Waterbury police department, went to Czerna's home in order to speak with the defendant to see if he had any information to assist them in their investigation. The defendant agreed to accompany the police back to Waterbury, where he was advised of and waived his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Upon learning that Foody was in the process of making a statement to the police, and that Pelosi was also in contact with Gray, the defendant confessed, both orally and in writing, to having shot the victim. As part of his confession, the defendant failed to explain his motive for shooting the victim, and stated: "I didn't know the guy or his car

and had no reason to shoot at him." Subsequent to providing the police with a voluntary statement, the defendant led O'Connor to the place where he and Gray had discarded the weapon. Additional facts and procedural history will be set forth as necessary.

I

## WARRANTLESS ENTRY INTO THE DEFENDANT'S BEDROOM

The defendant first claims that the trial court improperly denied his motion to suppress his confession because the police had illegally entered his bedroom without a warrant. Specifically, the defendant contends that the trial court improperly concluded that Czerna had the authority to consent, and did in fact consent, to the police entering the bedroom that the defendant shared with Czerna's daughter. Accordingly, the defendant argues, the warrantless entry by the police into the defendant's bedroom violated his constitutional rights and tainted any consent he gave to accompany the police back to Waterbury for questioning. We disagree.

The following additional procedural history and facts are relevant to our analysis of this claim. The defendant moved to suppress as evidence all of his oral and written statements, as well as his disclosure of the location where he and Gray disposed of the murder weapon, on the basis that this evidence had been gathered as a result of a warrantless entry into his bedroom at 200 Wakefield Circle, which violated his rights under the fourth and fourteenth amendments to the United States constitution, and article first, § 7, of the Connecticut constitution.[3] After a full evidentiary hearing, the trial court denied the defendant's motion in its entirety. The trial court ruled that the defendant was living at Czer-

_____

[3] We decline to reach the defendant's state constitutional claim because he has not provided an independent analysis under our state constitution. See *State* v. *Sinvil*, 270 Conn. 516, 518 n.1, 853 A.2d 105 (2004).

na's home on the morning of February 23, 2002, and that he had a right to privacy in the bedroom that he shared with Czerna's daughter. The trial court further ruled, however, that, prior to speaking with the defendant, Pelosi and the other police officers obtained valid consent from Czerna both to enter the premises at 200 Wakefield Circle, and also to leave the entryway of the home and go upstairs to the defendant's second floor bedroom. Specifically, the trial court found that "there was a consent to all of the areas where the police went and there were no limitations [placed] upon the police in any way."

The trial court found the following facts in support of its ruling. On the morning of February 23, 2002, Pelosi and five other members of the Waterbury police department proceeded to the 200 Wakefield Circle address in East Hartford. Pelosi and two other officers knocked on the front door of Czerna's home, while O'Connor led a team that went to a back entrance to the home located off of the living room. At the time of the officers' arrival at 200 Wakefield Circle, Czerna recently had completed the overnight shift at his place of employment, and was awake and watching television in the living room of his home.

When Czerna answered the knock at his front door, Pelosi identified himself as a police officer and informed Czerna that he wanted to talk to the defendant. Czerna let Pelosi and the other officers into the entryway of his home and informed them that the defendant was in an upstairs bedroom with his daughter. At this point, O'Connor knocked on the back door of Czerna's home, and Czerna voluntarily admitted O'Connor and two other officers into his living room. Pelosi then obtained permission from Czerna to leave the entryway and go upstairs to the bedroom occupied by the defendant, which was the first room upon reaching the second floor landing. The door to the defendant's bedroom was

partially open and Pelosi could see the defendant and his girlfriend half asleep on the bed. Pelosi entered the bedroom, introduced himself to the defendant, and asked him if he would be willing to accompany the police to the Waterbury police department. The defendant agreed and voluntarily accompanied Pelosi downstairs. The trial court found that neither Pelosi nor the other officer who had gone upstairs to locate the defendant used any force against the defendant, conducted a search of his bedroom or restrained the defendant in any way.

While Pelosi located the defendant in the second floor bedroom, O'Connor remained downstairs with two other officers and engaged in casual conversation with Czerna. O'Connor did not conduct a search of the premises or make a showing of force against Czerna or any other member of the household. After coming downstairs with Pelosi, the defendant finished getting dressed in the presence of Czerna and O'Connor, and then left with Pelosi and the other officers to travel back to Waterbury for questioning. At no point did the defendant indicate that he was unwilling to accompany the police for the purposes of a voluntary interview, and he was not handcuffed or placed in restraints either in Czerna's home or on the ride back to the Waterbury police department.

The trial court further found that, although probable cause existed for the defendant's arrest based on the statements provided by Foody and Bologna, Pelosi and the other officers did not seek to obtain a warrant prior to arriving at Czerna's home, and, accordingly, did not arrest the defendant upon locating him in the upstairs bedroom. Additionally, the trial court found that the officers' intent when going to Czerna's home was merely to interview the defendant in order to determine whether he had any information to contradict the incriminating accusations made by Foody.

It is useful to begin our analysis by noting that the defendant does not challenge the trial court's finding that the police entered the home with Czerna's consent. Rather, the questions before us center on whether Czerna also consented to Pelosi's entering the defendant's bedroom, whether Czerna possessed the requisite authority to give his consent, and whether the defendant voluntarily consented to accompany Pelosi for an interview. We conclude that the answer to all of these questions is yes.[4]

"A warrantless search is not unreasonable under either the fourth amendment to the constitution of the United States or article first, § 7, of the constitution of Connecticut if a person with authority to do so has freely consented to the search. . . . The state bears the burden of proving that the consent was free and voluntary and that the person who purported to consent had the authority to do so. . . . The state must affirmatively establish that the consent was voluntary; mere acquiescence to a claim of lawful authority is not enough to meet the state's burden. . . . The question whether consent to a search has in fact been freely and voluntarily given, or was the product of coercion, express or implied, [as well as whether the individual providing consent possessed the requisite authority] is a question of fact to be determined from the totality of all the circumstances. . . . As a question of fact, it is normally to be decided by the trial court upon the evidence before that court together with the reasonable inferences to be drawn from that evidence. . . . We may reverse [the trial court's factual] findings on appeal only if they are clearly erroneous." (Citations omitted;

---

[4] This conclusion renders it unnecessary to consider the defendant's argument that his confession to the police was the fruit of an illegal entry and arrest, as well as the state's argument that, if the entry to the bedroom were illegal, that did not taint the defendant's subsequent confession because the confession was sufficiently attenuated from the police entry.

internal quotation marks omitted.) *State* v. *Jones*, 193 Conn. 70, 78–80, 475 A.2d 1087 (1984).

As an initial matter, we note that in its ruling on the defendant's motion to suppress, the trial court made specific factual findings that Czerna consented not only to the police entering the first floor of his home, but also to Pelosi and another officer going upstairs to the defendant's bedroom. The trial court also found that the defendant was not arrested at Czerna's home and that the defendant voluntarily agreed to accompany the police for questioning. As noted by the state at oral argument before this court, however, the trial court did not make any explicit findings of fact related to Czerna's *authority* to consent to the police entering the second floor bedroom that the defendant shared with Czerna's daughter.[5] Despite the lack of such a finding, we conclude that in view of the evidence presented to the trial court, which related almost exclusively to the question of whether consent had been given, the trial court's denial of the motion to suppress necessarily included an implicit finding that Czerna also had the authority to consent to Pelosi entering the defendant's second floor bedroom. See id., 81.

Accordingly, we address in turn whether it was clearly erroneous for the trial court to find that: (1) Czerna possessed the requisite authority to allow police to enter the defendant's bedroom; (2) Czerna did in fact consent to the police entering that part of his home; and (3) the defendant voluntarily agreed to accompany

---

[5] Although we previously have elected to view a finding of consent to search as necessarily implying a finding that the requisite authority was held by the individual who consented, and continue to do so in the present case, we note that it is the better practice for the trial court to articulate expressly *all* of the subsidiary findings of fact on which its ruling is based. If such an articulation is lacking, counsel seeking to challenge the ruling on appeal should file a motion for articulation pursuant to Practice Book § 66-5.

the police to Waterbury for questioning. We are particularly mindful that all of these factual findings revolve principally around the credibility of the witnesses who appeared before the trial court, the evaluation of which is left to the trial court's sound discretion because of its function to weigh and interpret the evidence before it. See *State* v. *Reynolds*, 264 Conn. 1, 43, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

We begin with the trial court's implicit finding that Czerna held the requisite authority to permit the police to enter the defendant's bedroom. We conclude that there was sufficient evidence to support this finding.

"In order for third-party consent to be valid, the consenting party must have possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." (Internal quotation marks omitted.) *State* v. *Jones*, supra, 193 Conn. 80. The authority that justifies the third party consent rests on mutual use of the property by persons who have joint access or control for most purposes, so that any of the inhabitants has the right to permit the inspection in his own right, and the others have assumed the risk that any of the cohabitants might permit the common area to be entered. See *State* v. *Zindros*, 189 Conn. 228, 246–47, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984). Additionally, a host "has ultimate control" over his home where a guest is staying, and a "houseguest is there with the permission of his host . . . ." *Minnesota* v. *Olson*, 495 U.S. 91, 99, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990). "While the defendant, as an invited guest residing even temporarily in a private residence, may [have] a reasonable expectation of privacy in the premises . . . the [owner] clearly [has] the authority to consent" to the police entry into his home. (Citations omitted.) *State* v. *Edwards*, 214 Conn. 57, 74–75, 570 A.2d 193 (1990).

We also note that "the overwhelming majority of the cases" hold that a parent may consent to a police search of a home that is effective against a child, if "a son or a daughter, whether or not still a minor, is residing in the home with the parents . . . ." To overcome this authority, the child must establish "sufficiently exclusive possession of the room to render the parent's consent ineffective." 4 W. LaFave, Search and Seizure (4th Ed. 2004) § 8.4 (b), pp. 197–99. Factors that we previously have considered when evaluating whether a child has established sufficiently exclusive possession of the room include: whether the child is paying rent; who has ownership of the home; whether the door to the bedroom is generally kept closed; whether there is a lock on the door; whether other members of the family use the room; and whether other members of the family had access to the room for any reason. See *State* v. *Jones*, supra, 193 Conn. 81; 4 W. LaFave, supra, pp. 197–204.

The trial court concluded that the defendant had a right of privacy in the second floor bedroom that he shared with Czerna's daughter and their child. It did not, however, hold that the defendant's expectation of privacy was superior to that of Czerna. Indeed, Czerna's interest in his home was superior to that of the defendant, who was merely a houseguest staying at 200 Wakefield Circle at Czerna's discretion. In order to invalidate Czerna's consent to enter the bedroom, therefore, the defendant must establish that he maintained exclusive possession of the bedroom sufficient to demonstrate that he held an authority that was superior to Czerna's as the owner of the premises. The record simply does not support such a showing. We conclude that the trial court's implicit finding that Czerna possessed the requisite authority to allow police to enter the defendant's second floor bedroom was not clearly erroneous.

First, the defendant did not have exclusive possession or sole control over the bedroom. Czerna and his wife lived in the second bedroom adjacent to where the defendant was staying and routinely had visual access, and occasionally had physical access to the room because, from time to time, they assisted in caring for the defendant's infant child. Additionally, the defendant failed to indicate in any obvious way that his rights to the bedroom were exclusive. Specifically, the record does not reflect that the bedroom the defendant shared with Czerna's daughter had a lock or was kept closed even routinely. Indeed, Czerna's daughter testified that she and the defendant "never really kept [their bedroom door] all the way shut." Thus, the defendant's expectation of privacy in the second floor bedroom was reduced by the fact that the door to the bedroom was open when the police entered. The "[f]ourth [a]mendment provides no protection for what a person knowingly exposes to the public even in his own home or office . . . ." *United States* v. *Dionisio*, 410 U.S. 1, 14, 93 S. Ct. 764, 35 L. Ed. 2d 67 (1973). In short, by routinely leaving the door to the bedroom ajar, the defendant had a reduced expectation of privacy in the bedroom, and assumed the risk that Czerna would enter or look in at will, and afford others the same access. See *State* v. *Zindros*, supra, 189 Conn. 247.

The only evidence in the record to suggest that the defendant asserted exclusive possession over the bedroom is the fact that Czerna's daughter testified that the bedroom was where she and the defendant went when they wanted to be alone. This individual assertion does not render the trial court's implied finding regarding Czerna's authority over the premises clearly erroneous, and does not conclusively demonstrate that the defendant exerted exclusive control over the bedroom

to the point that Czerna was not able to grant access to an area of the home that he owned.[6]

Having established that the trial court's finding regarding Czerna's authority over the bedroom was not clearly erroneous, we now turn to the question of whether Czerna consented to the entry of the bedroom. The fact that Czerna consented to Pelosi going upstairs to the defendant's bedroom is amply supported by the record. First, the trial court specifically credited Pelosi's testimony at the suppression hearing during which he noted that Czerna had given him permission to go upstairs. In particular, Pelosi stated that, after being allowed into the foyer of Czerna's home, "[w]e told [Czerna] why we were there, and we asked him if we could go upstairs . . . and he [said], go ahead." Additionally, Pelosi testified that when he asked Czerna whether the defendant was at the 200 Wakefield Circle address, Czerna motioned toward the stairs leading to

---

[6] Even if we were to conclude that the record did not support the trial court's implied finding that Czerna had actual authority to consent to the entry of the second floor bedroom, we would arrive at the same conclusion because, in light of the information that the police had at the time of entry, at a minimum the police reasonably believed that Czerna had the authority to consent. Specifically, under federal law "a warrantless entry is valid when it is based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not [have such authority]." *Illinois* v. *Rodriguez*, 497 U.S. 177, 179, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990). Additionally, we agree with the Appellate Court that, " '[a]s with other factual determinations bearing upon search and seizure, determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?' " *State* v. *Vazquez*, 87 Conn. App. 792, 804, 867 A.2d 15, cert. denied, 273 Conn. 934, 875 A.2d 544 (2005). Based on the facts available to the police, namely, that Czerna owned the home, and that there were not any obvious indications that the defendant had established exclusive possession over the bedroom that was superior to Czerna, it was reasonable for Pelosi and the other officers to conclude that Czerna, as the homeowner, had the authority to allow them access to the room.

the defendant's bedroom, and that Czerna never objected to him going upstairs.

The defendant relies on the fact that Czerna's account of the police entry into his home differed from Pelosi's testimony in some respects. In particular, Czerna testified that the police knocked on his front door and that he agreed to let them in. Czerna also agreed that his conversation with Pelosi was very polite and that nothing in the officers' behavior was inappropriate or aggressive. Czerna testified, however, that Pelosi did not specifically ask him if he could go upstairs to the bedroom that the defendant shared with Czerna's daughter, but that Pelosi and the other officer went to the bedroom immediately after Czerna confirmed that the defendant was located upstairs. Additionally, Czerna testified that he did not gesture or point toward the stairs when answering Pelosi's questions about the defendant's whereabouts. Czerna did, however, corroborate certain of Pelosi's statements. In particular, Czerna testified that he watched the officers go upstairs to the bedroom that the defendant shared with his daughter, and that he never asked them to leave or told them that they were not permitted to go upstairs.

We conclude that it was not clearly erroneous for the trial court to conclude that Czerna consented, not only to the police entering his home, but also to their going upstairs to the bedroom the defendant shared with his daughter. The trial court specifically credited Pelosi's account of the events that transpired in Czerna's home, which was appropriate due to its function to weigh and interpret the evidence before it. See *State* v. *Reynolds*, supra, 264 Conn. 43. The resolution of any discrepancies between the testimony of Pelosi and Czerna, therefore, was for the trial court, not this court, to perform based on its assessment of credibility.

The defendant contends that Czerna did not consent to the police entering his daughter's bedroom because

the defendant was living in Czerna's home with Czerna's daughter as a tenant, and that this status demonstrates that Czerna had provided him with exclusive use of the bedroom. We disagree.

The trial court did not make any factual findings regarding whether the defendant's relationship with Czerna was that of a landlord and tenant because the defendant did not advance this claim in the trial court, and presented no evidence in support of it.[7] To the contrary, the defendant's sole claims before the trial court were that the police failed to obtain any consent to enter the bedroom at all, and that the behavior of the officers was overly coercive. This claim, therefore, raised for the first time on appeal, is not reviewable. See Practice Book § 60-5; *State* v. *Reddick*, 197 Conn. 115, 125, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986).

The defendant also argues that, upon receiving permission from Czerna to go upstairs and learning that the defendant was staying in a separate bedroom with Czerna's daughter and their child, the police were under an obligation to inquire further as to whether Czerna had authority to allow them to enter the room. In particular, the defendant notes that "[n]othing known to the officers disputed the reasonable inference that by allowing the defendant and his daughter to set up house in the Czerna [home] . . . Czerna gave up 'joint access and control for most purposes' to that bedroom." We disagree.

---

[7] Indeed, the evidence in the record is, at best, inconsistent with a tenancy status. Specifically, the evidence was that the defendant was staying at 200 Wakefield Circle at Czerna's discretion, that the door to the bedroom did not have a lock and was routinely kept open, that other family members passed by the open bedroom freely and had access to the room from time to time, and that the defendant failed to take any other steps to demonstrate that he had authority over the room as a tenant that was superior to Czerna's as the owner of the premises.

This argument overlooks the fact that, upon arriving at the door to the second floor bedroom, the police did not encounter anything to suggest that some sort of separate premises within Czerna's home had been established in the bedroom. Indeed, the police knew that Czerna owned the premises, and upon meeting him at the front door were told that the defendant was upstairs "in his daughter's bedroom," thus suggesting that, as a parent and the owner of the premises, he possessed authority over all parts of the home. Additionally, the door to the bedroom did not have a separate lock and was open, placing the defendant in open view to anyone who may have been allowed by Czerna up to the second floor. Contrary to the defendant's argument, therefore, based on what they knew and what they observed upon going upstairs, nothing the police encountered should have reasonably caused them to inquire further.[8]

The defendant's reliance on this court's holding in *Dotson* v. *Warden*, 175 Conn. 614, 623, 402 A.2d 790 (1978), is misplaced. In *Dotson*, we concluded that the owner of the premises did not have authority to consent to the police entry into the defendant's bedroom because the record demonstrated that the defendant resided in the bedroom alone, had a lock on the door, exercised control over everything in the room, and could exclude anyone he wished, including the owner. Id. The facts of the present case, wherein the defendant shared the bedroom with the owner's daughter and failed to demonstrate other indicia of exclusivity, are hardly similar. See *State* v. *Jones*, supra, 193 Conn. 81 (owner of premises and father had authority to consent to enter defendant's bedroom even though door was generally kept shut, father had policy of respecting defendant's privacy, and father did not enter bedroom without defendant's permission).

---

[8] See footnote 6 of this opinion.

The fact that the defendant voluntarily agreed to accompany the police is also amply supported by the record. First, the trial court specifically credited Pelosi's testimony that the defendant agreed to accompany him for questioning. In particular, Pelosi testified that "I told him I'm with the Waterbury police department and that we'd like to talk to him about a case that we were working on," to which the defendant replied, "sure." Additionally, Pelosi testified that the defendant was not placed under arrest at Czerna's home, and that he was never placed in handcuffs or restrained in any way. This testimony was similarly credited by the trial court, which specifically found that the defendant "was not handcuffed or placed in restraints by the police," and that "[t]he defendant never indicated that he was unwilling to accompany the police . . . ." Furthermore, the trial court credited Pelosi's testimony that the defendant was not handcuffed on the ride back to Waterbury, and found that the police did not search the defendant's bedroom or Czerna's home, and that there was "no coercive action by the police at 200 Wakefield [Circle]."

Pelosi's account of the officers' actions in Czerna's home was also corroborated by O'Connor, who observed the defendant after he came downstairs to the living room and finished getting dressed prior to accompanying the officers back to Waterbury for questioning. Specifically, O'Connor testified that the defendant was not placed under arrest when he came downstairs, that he finished changing out of the clothes that he was sleeping in, and that his hands were moving about freely and were not handcuffed. Czerna also observed the defendant in his living room prior to leaving with the officers and testified that he never saw the defendant in handcuffs, that the officers were not pushing, arguing, or harassing the defendant, and that he witnessed only polite conversation and nonaggressive behavior on the part of the police. Furthermore,

Czerna stated that the defendant appeared to leave willingly with the police.

We recognize that, as the defendant urges, he and Czerna's daughter recounted a very different story about the police entry into their bedroom, as well as the defendant's subsequent departure from Czerna's home. In particular, Czerna's daughter testified that she and the defendant awoke to guns in their faces and Pelosi yelling at them to get out of bed, at which point he handcuffed the defendant. Similarly, the defendant testified that Pelosi had his gun drawn while in the defendant's bedroom and that he was dragged out of bed, handcuffed, and told that he was under arrest. The defendant also maintained that he was handcuffed while he was downstairs getting dressed, and that he was handcuffed on the ride back to Waterbury.

It was not clearly erroneous for the trial court to find that the defendant voluntarily agreed to accompany the police for questioning. The mere presence of conflicting testimony before the trial court does not make a finding of fact that is detrimental to the defendant's case clearly erroneous. Indeed, the trial court specifically declined to credit the testimony of the defendant and Czerna's daughter, which was inconsistent with the testimony of Pelosi, O'Connor and Czerna chronicling the defendant's agreement to speak with the police and an environment free from restraint, search and coercion.

Finally, the defendant contends that Pelosi's consensual entry, and the defendant's willingness to accompany the police for questioning, were tainted by the fact that the police already had probable cause to arrest the defendant and had sufficient time to obtain a warrant. This argument is without merit. We recently rejected the identical argument, made against the same group of police officers, in State v. Aviles, 277 Conn. 281, 891 A.2d 935 (2006). In that case, we concluded

that "despite the presence of probable cause, the police were not under a separate obligation to obtain a warrant before trying to obtain consent to enter the apartment . . . . As previously noted, consent serves as a valid substitute for the warrant and probable cause protections afforded by the fourth amendment." Id., 304–305.

## II

## VOLUNTARINESS OF THE DEFENDANT'S CONFESSION

The defendant also claims that he did not voluntarily waive his fifth amendment right against self-incrimination, and that his subsequent confession to the police was not provided voluntarily because the entire course of police conduct was coercive. We disagree.

The following additional procedural history and facts are relevant to our analysis of this claim. As part of his motion to suppress, the defendant argued both that his rights under *Miranda* v. *Arizona*, supra, 384 U.S. 478–79, had been violated, and that his confession was the product of coercion by the Waterbury police. The trial court denied the defendant's motion to suppress in its entirety and concluded that the defendant's statement "was freely and voluntarily given to the police after being fully advised of his *Miranda* rights and his constitutional rights and, in fact, having waived those rights in writing twice . . . ."

The trial court found the following facts in support of its ruling. On the way back to Waterbury, the police did not speak to the defendant about the crime. Upon arriving at the police station, the defendant was led into an interview room where Sergeant Eugene Coyle notified the defendant of his rights against self-incrimination. Specifically, Coyle read the defendant his *Miranda* rights from a notice of rights card, the defendant indicated that he understood his rights as they

were read to him, and the defendant signed, dated and noted the time of his interview on the card, which the state later introduced as an exhibit at the suppression hearing. The trial court also found that the defendant had the capacity to understand his right against self-incrimination, that he was able to read and write, that he had familiarity with the police and the *Miranda* warnings, and that the defendant seemed under control both emotionally and psychologically. Coyle then interviewed the defendant about his involvement in the victim's murder. Upon learning that Foody and Bologna already had provided the police with statements, and that the police were also in contact with Gray, the defendant orally confessed to shooting the victim.

Coyle then led the defendant to another room in the police station that had a working computer, where he was joined by Detective Michael O'Loughlin. Coyle and O'Loughlin continued to question the defendant in this second room and prepared a typewritten statement for his review. The defendant corrected one spelling error in the document and then initialed each page and signed it, as well as a second voluntary rights form waiving his fifth amendment rights and his right to counsel. The trial court further credited Coyle's testimony, which was also independently corroborated by the testimony of O'Loughlin, regarding the officers' treatment of the defendant during the interview process. Specifically, Coyle and O'Loughlin testified that, while they were talking with the defendant, he was in good condition, he was offered food and soda, he used the bathroom twice, and he was not handcuffed or restrained in any way. Furthermore, the trial court found that neither Coyle nor O'Loughlin had acted aggressively toward the defendant during the interview, and that the entire process of making the defendant aware of his constitutional rights, questioning the defendant, obtaining a statement, memorializing it in writing, and obtaining

the defendant's signature, had lasted approximately forty minutes.

It is useful to begin our analysis by noting that the defendant does not claim that he did not understand his *Miranda* rights. Rather, he makes the narrow claim that he never *waived* them. We are not persuaded. In short, the trial court specifically found that the defendant waived his rights against self-incrimination, and the record supports that finding.

"To be valid, a waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 50. In considering the validity of a waiver, we look to the totality of the circumstances of the claimed waiver. See *State* v. *Hafford*, 252 Conn. 274, 295, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000). Although the issue of whether there has been a knowing and voluntary waiver is ultimately factual, the usual deference to fact-finding by the trial court is qualified in this area by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence. See *State* v. *Reynolds*, supra, 51.

The record amply reflects that the defendant knowingly, voluntarily and intelligently waived his *Miranda* rights in writing on two separate occasions: first, when he signed and dated the notice of rights card that Coyle had read to him at 12:31 p.m. on February 23, 2002; and second, when he signed the voluntary rights form that was a part of the written statement subsequently prepared by Coyle on the defendant's behalf. "An express written or oral waiver is strong proof of the validity of the waiver." (Internal quotation marks omitted.) Id., 52.

Additionally, Coyle testified that he read the defendant's *Miranda* rights out loud, and that he "asked [the defendant] if he would be willing to waive or give up his rights and answer [his] questions." The defendant "agreed that he would talk with [Coyle] in regards to the [victim's] murder."[9] Considering the totality of the circumstances, including the defendant's two signed waivers, we conclude that the trial court's conclusion that the defendant expressly waived his *Miranda* rights was supported by substantial evidence.

Similarly, we conclude that the trial court properly determined that the defendant voluntarily had confessed to the victim's murder. The standard for voluntariness of a *Miranda* waiver is the same as the standard for voluntariness of a confession. See *Colorado* v. *Connelly*, 479 U.S. 157, 169–70, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). Additionally, we have noted: "Irrespective of *Miranda* . . . any use in a criminal trial of an involuntary confession is a denial of due process of law.

[9] The defendant takes issue with this exchange, and argues that his agreement was limited to speaking with Coyle and did not extend to the first part of Coyle's question, which implicated a waiver of his constitutional rights. In particular, the defendant contends that he never actually said that he was willing to waive his right against self-incrimination, only that he was willing to talk to Coyle. This claim is entirely without merit. Even if the defendant's two written waivers were somehow not sufficient, the trial court clearly could have concluded, based on the defendant's conduct, that he waived his *Miranda* rights. See *State* v. *Shifflett*, 199 Conn. 718, 732, 508 A.2d 748 (1986) (defendant's conduct indicated waiver of *Miranda* rights even where defendant refused to sign waiver form or written confession); *State* v. *Hafford*, supra, 252 Conn. 296 ("defendant's conduct during his confession to [the police can illustrate] that he intended to waive [his] rights"). Coyle and O'Loughlin both testified that the defendant willingly had spoken to them about the victim's murder after signing the notice of rights card and listening to Coyle advise him of his rights against self-incrimination. Coyle also testified that the defendant not only specifically agreed to speak with him, but also never indicated that he wanted to discontinue the conversation. "The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative." *Oregon* v. *Elstad*, 470 U.S. 298, 318, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985).

. . . In order to be voluntary a confession must be the product of an essentially free and unconstrained choice by the maker. . . . [T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 54–55. Furthermore, the scope of review is plenary on the ultimate question of voluntariness, but the trial court's findings regarding the circumstances surrounding the defendant's questioning and confession are findings of fact that will not be overturned unless they are clearly erroneous. See *State* v. *Fields*, 265 Conn. 184, 197, 827 A.2d 690 (2003).

The trial court found that the police conduct was neither intimidating nor coercive in any manner. Specifically, the trial court stated: "[T]here was no evidence of overbearing conduct, coercion, or duress of any kind. Again, the defendant was fully advised of his *Miranda* and constitutional rights at least twice. The detention was for a few hours. The interrogation was not prolonged or intense for that matter. There was no physical punishment of any kind or coercion. And the defendant was offered and given both food and drink and, obviously, he was not lacking any sleep . . . ." As described previously, these findings were supported by the testimony of Pelosi, O'Connor, O'Loughlin and Coyle, as well as by Czerna, with respect to the police conduct that transpired in his home. Indeed, the only evidence in the record that the defendant was mistreated, threatened, or coerced by the police in any way was the defendant's account of his transport to Waterbury and subsequent conversation with Coyle and O'Loughlin.[10]

---

[10] Among other things, the defendant testified that, upon arriving at the Waterbury police department, he was handcuffed to a chair that weighed in excess of fifty pounds and was forced to carry that chair around with

Having had the opportunity to observe the demeanor of all of the witnesses, the trial court specifically declined to credit this testimony. Accordingly, we conclude that the factual findings of the trial court were not clearly erroneous, and that the defendant's confession was freely given and not the result of overbearing police conduct.

The judgment is affirmed.

In this opinion the other justices concurred.

him as he was moved from room to room. Additionally, the defendant testified that he felt very intimidated by Coyle and O'Loughlin because they screamed at him repeatedly, called him a liar, and physically abused him when he failed to provide them with the answers that they were looking for.