STATE OF CONNECTICUT *v.* JERMAINE JONES
(SC 17613)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

Argued April 17, 2006—officially released March 13, 2007

*Jeremiah Donovan*, special public defender, for the appellant (defendant).

*Julia K. Conlin*, assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Robin Lipsky* and *Amy Sedensky*, assistant state's attorneys, for the appellee (state).

*Opinion*

PALMER, J. The defendant, Jermaine Jones, was charged with one count of murder in violation of General Statutes § 53a-54a and one count of criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). The trial court granted the defendant's motion to sever the two counts, and the defendant elected a jury trial on the murder charge and a bench trial on the firearm charge. Thereafter, a jury found the defendant guilty of murder and the trial court found the defendant guilty of criminal possession of a firearm.[1] The trial court rendered judgment thereon,[2] and the

---

[1] Upon agreement of the parties, the defendant's jury and bench trials proceeded simultaneously, with the state supplementing the record of the bench trial following the conclusion of the jury trial.

[2] The trial court imposed a total effective sentence of sixty-five years imprisonment.

defendant appealed. On appeal,[3] the defendant claims that the trial court improperly (1) ordered him removed from the courtroom during trial, (2) denied his request to represent himself, and (3) denied his motion to suppress his confession. We reject these claims and, accordingly, affirm the judgment of the trial court.

The state adduced the following facts at trial. In June, 2001, the defendant was residing in Hartford with his girlfriend, Erica Minnifield. At that time, the couple was not getting along because the defendant thought that Minnifield was too flirtatious with other men.

On the afternoon of June 22, 2001, the defendant and Minnifield traveled together to Waterbury to visit friends and family. They parted ways, however, immediately upon arriving there. After stopping at her mother's house, Minnifield went to a local mall with the victim, Thomas Williams, whom she had met the week before, and purchased several new outfits. That evening, the defendant saw Minnifield outside a local bar wearing one of the new outfits and immediately suspected that another man had purchased the outfit for her. The defendant confronted Minnifield about his suspicions, and an argument ensued.

Later that evening, the couple received a ride back to Hartford from a friend, Theo Byrd. On the ride home, the defendant, who was seated in the front passenger seat of Byrd's car, again confronted Minnifield, who was in the backseat, about her new clothing. The argument became violent when the defendant reached into the backseat and began to hit Minnifield. During the altercation, the defendant, who was holding a knife, cut Minni-

---

[3] Because the defendant's claims on appeal involve alleged improprieties pertaining both to his trial for murder and to his trial for criminal possession of a firearm, this appeal pertains to both of those trials. References hereinafter to the defendant's trial are to his trial for murder and to his trial for criminal possession of a firearm.

field on her right arm. As soon as they arrived home in Hartford, Minnifield bolted from the car and ran into a neighbor's yard. The defendant found her there and dragged her, kicking and screaming, into the couple's house. Once inside the house, the defendant began cutting Minnifield's pants from her body with the same knife that he had used in his earlier assault on her. The following morning, while the defendant was still asleep, Minnifield fled to her mother's home in Waterbury.

That evening, the defendant was riding around Waterbury in a car driven by a friend, David Jackson, when Minnifield and the victim drove by in the victim's car. Upon observing Minnifield with the victim, the defendant became very angry and jealous. Later that evening, the defendant again saw Minnifield and the victim riding in the victim's car.

Jackson eventually dropped off the defendant, who met up with Byrd. The defendant and Byrd proceeded to drive around Waterbury in Byrd's car. Eventually, the two men saw the victim's car parked on Elmwood Avenue. Byrd stopped his car, and the defendant got out. As the defendant exited the vehicle, he reached into his jacket pocket and cocked the hammer of a .45 caliber semi-automatic handgun that he had concealed there. The victim, who was approaching his own car, greeted the defendant, and the defendant responded, "[Y]o, you gonna stop fucking around with my girl?" The victim laughed and asked the defendant what he meant. The defendant told him that he was not playing around and that the next time he saw him with Minnifield, he was going to kill him. The defendant then removed the handgun from his jacket. Upon seeing the weapon, the victim became scared and put his car into reverse. The defendant aimed the gun at the victim and shot him four times, mortally wounding him. Additional facts will be set forth as necessary.

I

The defendant first claims that the trial court improperly removed him from the courtroom on the second day of trial in violation of his right of confrontation guaranteed under the sixth and fourteenth amendments to the United States constitution.[4] The defendant's claim is twofold: first, before ordering that the defendant be removed from the courtroom, the trial court improperly failed to warn him that his disruptive conduct could result in his removal; and second, the trial court improperly refused to permit the defendant to return to the courtroom despite the defendant's expressed willingness to conduct himself appropriately. We reject the defendant's claim.[5]

---

[4] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

The confrontation clause of the sixth amendment is made applicable to the states through the due process clause of the fourteenth amendment. *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

[5] The state contends that we should not address this claim because defense counsel never formally objected to the defendant's removal from the courtroom and because, on appeal, the defendant has not expressly requested review of this claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), which governs appellate review of unpreserved constitutional claims. We disagree. The record reveals that, after the defendant had been removed from the courtroom, he requested, through counsel, permission to return. The trial court denied the defendant's request, explaining its reasons in detail. Under the circumstances, the defendant's request is sufficient to preserve the issue for purposes of appeal. Even if the claim had not been preserved, however, we have stated that, "[i]n certain instances, dictated by the interests of justice, we may, sua sponte, exercise our inherent supervisory power to review an unpreserved claim that has not been raised appropriately under the *Golding* or plain error doctrines." *State* v. *Ramos*, 261 Conn. 156, 172 n.16, 801 A.2d 788 (2002). Because the record in the present case is adequate for our review and because the defendant's claim involves a constitutional right that we have characterized, in terms of importance to an accused, as equivalent to the right to trial itself; e.g., *State* v. *Lopez*, 271 Conn. 724, 732, 859 A.2d 898 (2004); this would be an appropriate case to invoke our supervisory power, if necessary, to address the defendant's claim.

The following additional facts and procedural history are relevant to our resolution of this claim. Alan D. McWhirter, the chief public defender for the judicial district of Waterbury, was appointed to represent the defendant following his arrest for the victim's murder.[6] Not long after McWhirter's appointment, however, the defendant became dissatisfied with McWhirter and, on several occasions, sought to have him removed from the case. In particular, on January 30, 2002, the defendant complained to the trial court, *Damiani, J.*, that McWhirter had failed to file motions on his behalf and was not preparing a defense. The trial court explained to the defendant that McWhirter was an experienced and able trial attorney and that, if the court dismissed McWhirter, the defendant would have to hire a private attorney because he was not entitled to the appointment of a different public defender. The court then gave the defendant an opportunity to consult with McWhirter outside the courtroom, which appeared to alleviate the defendant's concerns.

On June 11, 2002, the defendant filed a motion to dismiss McWhirter. A hearing on the motion was held on July 2, 2002, at which time the defendant complained that, among other things, McWhirter had not returned his telephone calls and had refused to file motions that the defendant had instructed him to file. McWhirter responded that, in fact, he and the defendant had had a great deal of contact, that he had arranged for the defendant to call him at his office at prearranged times, and that the public defender's office was actively investigating the defendant's case. At the conclusion of the hearing, and after McWhirter had spoken to the defendant, the trial court, *Damiani, J.*, marked the defendant's motion to dismiss counsel as withdrawn without prejudice.

---

[6] The defendant has been incarcerated in lieu of bond since his arrest.

A little more than one week later, however, on July 11, 2002, the defendant again expressed dissatisfaction with McWhirter, stating in a letter to the court: "I know just as well as you know [that] my rights have been violate[d] and that [McWhirter] is not doing his job as a defender. He was suppose[d] to advise me of my rights to waive my probable cause hearing, which he never did. I had to find that out myself. Now that's another violation of [d]ue process of [l]aw. So what are [you] going to do about these violation[s] of [law]?" (Internal quotation marks omitted.) In response to the defendant's letter, the trial court, *Damiani, J.*, held another hearing on July 24, 2002. At that time, the defendant stated, among other things, that he was upset because McWhirter had refused to file a motion to dismiss. The trial court explained to the defendant that defense counsel had no basis on which to file such a motion and told the defendant to speak to McWhirter to resolve any problems that the defendant might have. The defendant agreed and the hearing concluded.

Although represented by counsel, the defendant persisted in personally filing numerous motions throughout the course of the proceedings.[7] In addition, at virtually every court appearance, notwithstanding the presence of defense counsel, the defendant argued with the trial court over points of law and regularly attempted to reargue issues that already had been ruled on.

One of the motions that the defendant filed himself was a motion for a speedy trial. At a hearing on April 2, 2003, the trial court, *Iannotti, J.*, informed the defendant that it would not recognize his pro se motion for a speedy trial because he was represented by counsel. The defendant responded that he wished to file an "[e]mergency" motion to dismiss counsel. The defendant also asked why the court could not appoint a new

---

[7] The defendant filed these motions on more than ten separate occasions.

attorney for him. The court responded that the office of the public defender had selected McWhirter to represent him and the court could not interfere with that decision. The trial court further advised the defendant that it would be a mistake for him to proceed pro se and offered to give him ample time to hire substitute counsel, if he wished to do so. The defendant responded, among other things, that the court was "throwing [him] to the wolves." The defendant then asked the court whether the state might offer him a deal or whether he would be forced to go to trial. The court responded that a resolution of the case might be possible and asked the state's attorney and defense counsel whether there had been any plea negotiations. Defense counsel responded that the state had made an offer to the defendant but that the defendant had rejected it. Thereafter, the following colloquy ensued:

"The Defendant: Well, to my understanding, it was not offered to me by [a] judge or a prosecutor. It was— to my understanding, I was downstairs and this gentleman—well, counsel came to me with this accusation [sic] of thirty-eight years.

"The Court: Was that Judge Damiani's offer?

"The Defendant: Yes, it was Your Honor. And, Your Honor, come on now. You know what I mean. And this is what counsel came to me with.

"The Court: That's his job.

"The Defendant: That's his job. I understand that. But he's saying that the judge and the prosecutor offered that. They never offered me that on record."

Thereafter, the state's attorney, John A. Connelly, stated, "[the] state would offer [the defendant] forty-five [years imprisonment] today on the murder charge, Judge," whereupon the defendant responded:

"The Defendant: Forty-five years?

"[Assistant State's Attorney]: Forty-five, four five. . . .

"The Defendant: Hold on. This is a circus or . . . is this something serious? My life—hold, hold. . . . My life is on the line right here, and the way that you're being . . . . I'm going to tell you something. I'm going to be very calm. I understand that. I understand that. But I have a right, man. I have a right of freedom of speech, man.

"The Court: Your freedom of speech needs to be directed to me.

"The Defendant: Yes, Your Honor, I understand, but I didn't like the way he came out with it. Forty-five years? Forty-five years? That's like—you know, this is a joke to him. My life [being] hung [sic] right now is not a joke.

\* \* \*

"The Defendant: Bastard.

"The Court: Sir, you don't need—

"The Defendant: Let me go, man, let me go.

"The Court: Mr. Jones, don't do that.

"The Defendant: He's still talking to me, man.

"The Court: Don't do that because you don't want me to have to start talking about contempt of court. You don't want that."

The court thereafter continued the case for four weeks so that the defendant could decide, inter alia, whether he wanted to be tried by a jury or by the court.

On May 12, 2003, McWhirter informed the trial court that, due to a grievance that the defendant had filed

against him with the statewide grievance committee, he no longer would be representing the defendant. Lawrence Hopkins, a special public defender, subsequently was appointed to represent the defendant.[8]

On January 27, 2004, the trial court, *Hartmere, J.*,[9] held a hearing on the defendant's motion to suppress his confession to the Waterbury police. In an oral ruling on January 30, 2004, the trial court denied the defendant's motion.[10] After the court had concluded its ruling, the assistant state's attorney and defense counsel agreed that there was nothing further for the court to consider regarding the defendant's case. Defense counsel informed the court, however, that the defendant wished to speak. The court recognized the defendant, who proceeded to challenge the court's findings of fact and conclusions of law on his motion to suppress. After some discussion between the court and the defendant, the court stated to the defendant: "I'm not going to argue with you . . . . I've made my ruling. [Defense counsel] has taken an exception, but your rights were not violated . . . ." The defendant nevertheless continued to insist that the trial court improperly had denied his motion. Although the court again told the defendant that there would be no further argument on the matter, the defendant persisted in disputing the court's ruling. The trial court interrupted the defendant, however, and terminated the hearing, stating: "All right. I've heard enough. I've made my ruling. That's it. You have the right to appeal it." Trial was scheduled to commence on the next court day.

Prior to the commencement of evidence, on the first day of trial, defense counsel informed the court that the defendant had injured his hand while being transported

---

[8] We note that the defendant also filed a complaint against Judge Iannotti.

[9] Hereinafter, all references to the trial court are to the court, *Hartmere, J.*

[10] The facts relevant to the defendant's motion to suppress his confession are set forth at part III of this opinion.

back to jail after the hearing on the motion to suppress. A marshal later informed the court that the defendant had put his hand though a Plexiglas window in anger over the trial court's decision to deny his motion to suppress.

Later that day, the state called Minnifield as a witness. Under questioning by the assistant state's attorney, Minnifield testified that the defendant had cut her with a knife after becoming angry and jealous when he saw her wearing a new outfit. During a recess, the court admonished the assistant state's attorney for eliciting that testimony from Minnifield in light of a pretrial order that allowed the state to introduce evidence that the defendant had used a knife to remove Minnifield's pants but that precluded the state from eliciting testimony that the defendant had cut Minnifield with a knife. The assistant state's attorney apologized, stating that she did not realize that Minnifield's testimony was barred by the order. When the court asked defense counsel if he had anything to say, he stated that he could not recall whether the assistant state's attorney had elicited testimony from Minnifield that the defendant intentionally had cut her with the knife and that, in any event, he had not objected to the testimony at the time because he did not want to focus the attention of the jury on that testimony. Defense counsel then objected "outside the presence of the jury to any inference that [the defendant] cut [Minnifield] with a knife for the obvious reason that that's not the case that's on trial here . . . ." Defense counsel also asked the trial court for "a cautionary instruction either at the end of the case or at some time that the court deems appropriate during the . . . case." The trial court later instructed the jury that the defendant was not on trial for assaulting Minnifield and that they should disregard any testimony by Minnifield to that effect.

At the commencement of proceedings the next day, however, defense counsel informed the court that the defendant wished to address the court for the purpose of seeking a mistrial due to Minnifield's testimony the previous day. According to defense counsel, the defendant believed that the testimony improperly had impugned his character by suggesting that he was abusive. The trial court responded that, because the issue that the defendant had raised involved a legal question, the court would consider the matter only if defense counsel wished to revisit the issue. Defense counsel responded that, in his view, the trial court adequately had instructed the jury the day before regarding Minnifield's testimony. Defense counsel subsequently informed the court that the defendant, "as a result of what he consider[s] to be . . . the prejudicial impact of . . . Minnifield's testimony . . . would choose personally at this point not to go [forward] with the proceedings." Defense counsel further stated that he had explained to the defendant that the trial would proceed in his absence. Thereafter, the following colloquy between the court and the defendant occurred:

"The Defendant: Your Honor . . . I don't even want to be here then.

"The Court: Are you sure . . . ?

"The Defendant: Yeah, I'm positive, because my life is on the line right here, right? Now, I'm the defendant. He's counsel. For one, I don't agree with his . . . misrepresentation and his performance that he gave yesterday also, because I had asked him personally to—

"The Court: . . . I'll let you leave in a moment, but let me just be sure you know what you're doing.

"The Defendant: I know what I'm doing, Your Honor.

"The Court: The case is going to proceed, you know, without you.

"The Defendant: Well, it doesn't matter because I'm not going to sit here while my defamation of character is being presented in the case as evidence. Basically, it was presented as evidence, Your Honor.

"The Court: I've ruled on that. . . . It's a legal ruling by the court.

"The Defendant: It's out already, Your Honor.

"The Court: You don't have to agree with me.

"The Defendant: It's out already. It doesn't matter how you [are] going to see it. It's out.

"The Court: All right. Do you wish . . . to . . . absent yourself today?

"The Defendant: Yeah, 'cause . . . I'm not going to sit here—

"The Court: All right.

"The Defendant:—but—

"The Court: That's what you want to do?

"The Defendant: But, also, I would like you to know that, personally, I'm objecting to counselor's representation and to [his] performance.

"The Court: All right.

"The Defendant: So, basically, I want that to be noted on the record.

"The Court: All right. Just as long as you know we're going to proceed. The state has its witnesses here. I'm not going to argue with you about every legal ruling that I do, as I have been—

"The Defendant: That's just fair.

"The Court: And we're going to proceed. Now, you're going to be prejudiced by this, you understand that?

"The Defendant: It was prejudice to me already.

"The Court: When you're not here, I'm talking about. The jury's going to notice you're not here when we're proceeding with this trial.

"The Defendant: If that's—if that's—

"The Court: I'm sure [defense counsel]—

"The Defendant:—how I got to go forward with this because the fact that I'm sitting here, I'm on trial for murder, not assault.

"The Court: Do you understand what I just said to you?

"The Defendant: Your Honor, yes, but please hear me out.

"The Court: Go ahead.

"The Defendant: Please hear me out.

"The Court: Very briefly. We've been keeping the jury out there for almost an hour now . . . .

"The Defendant: Now, we . . . sat down last week, and the state knows that. You gave them an order. Not only did she . . . [bypass it] once but twice. . . .

"The Court: I've addressed that.

"The Defendant: And then—no, and then she [brought] another victim . . . to another charge onto the stand and . . . put me out there as an abusive person, which ha[s] nothing to do with the murder at all.

"The Court: Part of it does have something to do with the murder . . . .

"The Defendant: No it doesn't. No, it doesn't.

"The Court: I'm not going to argue with you about this.

"The Defendant: It doesn't have [any]thing to do with the murder, Your Honor.

"The Court: I mean, I've made my ruling.

"The Defendant: I'm not on trial for assault.

"The Court: . . . [Y]ou understand you're going to be prejudicing yourself by leaving today. You understand that? Do you understand that?

"The Defendant: Well, I want to—I'm going to put a motion in to dismiss counsel, then. . . . And I'll take my case myself. . . . I'll take the case myself, Your Honor.

"The Court: That's denied . . . .

"The Defendant: I have a right, Your Honor. That's my constitutional right.

"The Court: All right.

"The Defendant: You're laughing, but I'm serious.

"The Court: Marshals, remove [the defendant].

"[Marshal]: Let's go . . . .

"The Defendant: I'm not going nowhere, man.

"[Marshal]: Come on.

"The Defendant: Don't touch me."

A scuffle ensued.

After the defendant was removed from the courtroom, the trial court noted, for purposes of the record, that the defendant "had to be physically restrained by a number of marshals. I guess to say [the defendant] is a violent man is understating the obvious." The trial court then asked defense counsel if he wished to address the court. Defense counsel responded that, "in conjunction with [the defendant's] outburst, [the defendant] expressed a desire to represent himself, which

probably is his right if he were able to conduct himself appropriately in the courtroom." The trial court responded, "That's the problem. He's still screaming now." Defense counsel then suggested that the court recess for the day to give the defendant time to calm down and to decide whether he wished to absent himself from the trial or to proceed pro se. The trial court responded: "[The defendant] has . . . a history of violence just in this case. . . . I still don't know the answer to yesterday's violence where he was unhappy with my ruling from last Friday and smashed, apparently, a Plexiglas window, injuring his hand, and was going to be seen by a doctor last night. We have corrections here. Was he seen last night?" A correction officer indicated that the defendant had been examined by a physician and that he had broken a bone in his hand. The trial court then stated: "I'm not optimistic, to say the . . . least, that [the defendant]—I don't know that he'll last through another objection overruled if he—I think it would be foolhardy to allow him to represent himself given his history of violence and, as I say, just in this courtroom. Today's episode—it took eight to ten marshals to get him out of the courtroom. I mean . . . he just refuses to listen or to be bound by any ruling of the court as everyone in the courtroom recognizes, I think. He just won't take an answer which goes against him, and his reaction to all of this is always the same, it's violence.

"So I don't think it would be in anyone's interest to allow him to represent himself. He does have a right to absent himself. Of course, he can, by his conduct, waive his presence in the courtroom, which is what he's done right now, and that's the reason we're proceeding without him, because we obviously don't have any choice, when someone reacts the way he does with such extreme violence, but to remove him from the courtroom . . . . So that's where we are now. . . .

[The defendant] has, by his actions, voluntarily absented himself from the courtroom. . . . [T]here aren't options available to the court other than to recess and see whether he can calm down." The trial court then called a three hour recess to give the defendant time to calm down and to consult with defense counsel.

After the recess, the trial court excused the jury for the remainder of the day. At that time, Anthony Candido, the chief marshal in the judicial district of Waterbury, informed the court that, after the defendant had been removed from the courtroom, he refused a marshal's request to place his hands behind his back and yelled, "I will continue to fight, and . . . I will bring you people down." One marshal was injured trying to subdue the defendant and had to be taken to the hospital. Candido asked the court if, in the future, the defendant could be kept in full restraints, that is, belly chains and leg irons,[11] when he was in the courtroom in order to ensure the safety of everyone in the courtroom. After expressing the concern that the jury might learn about the defendant's violent courtroom behavior from media reports,[12] the trial court stated: "I'm very concerned, having observed . . . the defendant over the course of jury selection, especially after ruling on his motions, his reaction thereto, and it just appears every time the defendant gets an adverse ruling, he reacts and reacts violently at times, including breaking his hand after . . . what he viewed as losing on the motion to suppress.

"And then, today, of course, it took about eight marshals to get him out of the courtroom, and he just refused to stop arguing his points, and he just . . . will not take direction. . . .

---

[11] The defendant apparently had been required to wear leg irons from the commencement of the trial.

[12] Before excusing the jury for the day, the court cautioned the jury to avoid all local news reports for the duration of the trial.

"But I am very concerned . . . about the violent nature of his behavior. And before I hear from counsel on this, I have thought about it for the remainder of the morning after we broke. And I'm not at all sure that this trial could proceed in an orderly fashion with [the defendant] in the courtroom. He just . . . refuses to accept any ruling that doesn't go in his favor. And I am concerned, as is Marshal Candido, about the safety of people in the courtroom. That includes the prosecutors, the other court personnel, the jury and his own counsel. He just . . . lashes out at adverse rulings.

"I think before [the defendant] was removed . . . he was fully advised that the trial would continue in his absence. And I believe I told him it was not in his interest to do that. But, even in doing that, he just refuses—and he had time to calm down is what really concerns the court. He had time to calm down during this morning's proceedings, and he just will not listen or will not even attempt to behave from what the court can see.

"So, I think it's—the record as it stands, I think he's forfeited his right to . . . be in the courtroom by his engaging in this disruptive and volatile, disorderly, disrespectful conduct. And . . . I'm not optimistic that, despite what he says or may say down the road—and I haven't heard anything yet—but even if he were to promise to try to behave, based on having observed him over the course of the last two weeks or so, I am very concerned for the court personnel, who will be closer to him than I, for their safety because he just does not control himself and does not appear to want to control himself, more importantly.

"So, the only way for him to be in the courtroom would be in severe restraints so that . . . he could not hurt any personnel. And I'm not sure, frankly, in the interest of justice, that that should happen. He, I think,

is better off, given his course of conduct, not being in the courtroom. But, again, I'm going to listen to counsel about all of this."

Defense counsel responded that he had had an opportunity to speak to the defendant after the removal of the defendant from the courtroom and that the defendant had stated that "he simply wanted no part of the trial" and that "he didn't even want to be brought into the building" anymore. Defense counsel requested, however, that, each day, the defendant be given the option of being transported to the courthouse or remaining at the correctional facility. The trial court agreed with defense counsel's proposal and instructed the responsible court personnel and department of correction personnel accordingly.[13] Thereafter, Candido informed the court that there was a holding cell adjacent to the courtroom that was equipped with a monitor and speaker system, from which the occupant could observe and listen to the trial proceedings. After acknowledging the possibility of allowing the defendant to monitor the trial from that cell if he agreed to desist from any further violent conduct, the trial court stated: "If [the defendant] does not want to come to [the courthouse], we won't force him. And . . . if he decides to come . . . my inclination is to have the defendant next door [so that he will] be able to view and listen to the proceedings and have [defense counsel] confer with him. But I'll listen.

---

[13] The court noted that, ordinarily, an incarcerated defendant who has waived his right to be present at trial would be transported from the correctional facility to the courthouse so that, if the defendant changed his mind about absenting himself from the trial, he could be brought into the courtroom immediately. The court further noted, however, that, because the defendant in the present case had proven himself to be so violent and dangerous, the court was concerned for the safety of the personnel responsible for transporting him from the correctional facility to the courthouse. In light of that concern, the court opted to permit the defendant to remain at the correctional facility if he expressed a preference to do so.

"If that's what happens, if the defendant decides to come to court, I'll listen to any other requests. But, as of now, based on everything the court has observed and stated today and heard today, my inclination is not to bring him into the courtroom unless he is highly restrained. And I'll leave that to [defense counsel] and the defendant as to which . . . of those two courses they want to choose, if and when we reach that point."

The next morning, defense counsel informed the trial court that the defendant had elected to come to court that day and had expressed the desire to be present in the courtroom, but had not agreed to wear any restraints other than the leg irons that he ordinarily wore. The trial court asked the deputy chief marshal, Gino DiMauro, whether he was comfortable allowing the defendant back into the courtroom.[14] DiMauro responded that he would like an opportunity to assess the defendant before answering the court's question. After DiMauro had left to speak to the defendant, the trial court explained that it had reviewed the federal and state authority relevant to the issue of whether the defendant should be permitted to return to the court-room under the circumstances. The court then stated: "[T]his court is still very concerned about . . . allowing the defendant to remain in this courtroom during these proceedings. Given his track record and outbursts here, this court has no reason to believe the defendant will be able to comport himself and that he won't react violently again the next time a ruling goes against him. . . . I'm particularly concerned about many of the court personnel and, for that matter, the jury, and any effect [the defendant's behavior] may have on the jury. . . . I personally . . . think having the defendant severely restricted in terms of movement in the courtroom is much more prejudicial than having

[14] DiMauro was in charge that day because Candido was away at a meeting.

him absent and directing the jury to draw no adverse inference [from] his absence."[15]

When DiMauro returned, he informed the court that the defendant had agreed to attend the trial in full restraints and that he had promised that there would be no further outbursts. DiMauro further indicated that he believed that, under the circumstances, his personnel, with the assistance of department of correction personnel, could maintain security in the courtroom. After inquiring about the availability of additional security personnel, the trial court reluctantly agreed to the plan and called a recess so that the marshals could bring the defendant into the courtroom. A short time later, however, DiMauro returned to the courtroom and informed the court that the defendant had been somewhat confrontational toward the marshals when they had gone to get him, that he was visibly agitated and that he was "still talking about yesterday." DiMauro further stated that the defendant did not think that he had done anything wrong the day before and believed that he had been treated unjustly. The court stated, "Well, now we're back to it sounding like there's going to be real trouble if he's brought into the courtroom." DiMauro responded: "Yes, sir . . . that's my assessment. My feeling [is] he just wants to get in the courtroom to cause further discomfort." DiMauro added that, in light of the defendant's threats the day before to "bring [the marshals] down with him," he was not comfortable bringing the defendant back into the courtroom at that time. When the court asked defense counsel if he had any comment, he stated that he did not.

---

[15] When the court asked defense counsel whether he had anything to say, defense counsel stated, "I entirely understand the court's concerns under the circumstances and would simply tell the court once again what [the defendant] relayed to me, that he would like to be present for the proceedings now." Defense counsel also informed the court that he had asked the defendant if he was willing to wear full restraints but that the defendant had ignored the question.

Upon reconsideration, the trial court ruled that, by virtue of the defendant's disruptive behavior, the defendant had waived any right to be present during the proceedings. The trial court further stated: "I'll also find that, based on the [marshal's] assessment . . . were [the defendant] allowed into the courtroom, it is very likely that he will cause additional disruptions before the jury . . . possibly result[ing] in further injuries to either court personnel, the jury, witnesses or spectators for that matter." The court concluded that "the wisest and safest course of action at this point is to have the defendant remain in one of the outer holding rooms here where he will be able to listen to the proceedings, and counsel will be available to consult with him at appropriate times. And I'll leave that to you, [defense counsel], as to when you wish to consult with him, and we will accommodate that. But I just feel, again, based on everything that's transpired, based on all of the authority which I've cited previously yesterday and today, that the situation is just too volatile, remains too volatile, to allow the defendant to further disrupt these proceedings."[16]

Soon thereafter, defense counsel informed the court that he had consulted with the defendant, who stated that he wanted a new attorney, and that, if he could not be present in the courtroom, he preferred to be taken back to the correctional facility at which he was incarcerated. The trial court responded that, after the defendant had been removed from the courtroom the previous day, he could be heard screaming and pounding on the walls of his holding cell and that, in light of the defendant's prior behavior, it probably was best to

---

[16] The court subsequently instructed the jury that the defendant was absent from the courtroom with the permission of the court and that the jury could draw no adverse inference from the defendant's absence. Both the assistant state's attorney and defense counsel expressed their approval of the instruction, the propriety of which has not been challenged on appeal.

allow him to return to his prison cell. The court reiterated that, for the duration of the trial, the defendant would be asked every morning whether he wished to be transported to the courthouse but that he would not be forced to come against his wishes. The defendant did not return to the courtroom until his sentencing. With these facts in mind, we summarize the legal principles that govern our review of the defendant's claim.

"We begin with a fundamental tenet of criminal jurisprudence: a criminal defendant has a constitutional right to be present at all critical stages of his or her prosecution. *Rushen* v. *Spain*, 464 U.S. 114, 117, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983) (the right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant). Indeed, [a] defendant's right to be present . . . is scarcely less important to the accused than the right of trial itself. . . . *State* v. *Simino*, 200 Conn. 113, 127, 509 A.2d 1039 (1986). Although the constitutional right to be present is rooted to a large extent in the confrontation clause of the sixth amendment, courts have recognized that this right is protected by the due process clause in situations [in which] the defendant is not actually confronting witnesses or evidence against him. *Snyder* v. *Massachusetts*, 291 U.S. 97, 105–106, 108, 54 S. Ct. 330, 78 L. Ed. 674 (1934); see *State* v. *Jarzbek*, 204 Conn. 683, 691–92, 529 A.2d 1245 (1987) (recognizing that right to be present similarly is guaranteed by article first, § 8, of our state constitution), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988)." (Internal quotation marks omitted.) *State* v. *Lopez*, 271 Conn. 724, 732, 859 A.2d 898 (2004).

Notwithstanding the fundamental nature of the right of confrontation, it is well established that "[a criminal] defendant may waive [the] right . . . in a number of ways, such as by his voluntary and deliberate absence from trial; *Taylor* v. *United States*, 414 U.S. 17, 94 S.

Ct. 194, 38 L. Ed. 2d 174 (1973); by disruptive conduct which requires his removal from the courtroom; *Illinois* v. *Allen*, [397 U.S. 337, 342–43, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970)]; *State* v. *Drakeford*, [202 Conn. 75, 79, 519 A.2d 1194 (1987)]; *State* v. *Simino*, supra [200 Conn. 129]; see *State* v. *Johnson*, 185 Conn. 163, 178–79, 440 A.2d 858 (1981), aff'd, 460 U.S. 73, 103 S. Ct. 969, 74 L. Ed. 2d 823 (1983); or by causing a witness to be unavailable for trial for the purpose of preventing that witness from testifying." *State* v. *Jarzbek*, supra, 204 Conn. 698. With respect to waiver of the right of confrontation by disruptive conduct, "a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom. Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." *Illinois* v. *Allen*, supra, 343. Finally, the trial court has broad discretion in determining whether the removal of an accused from the courtroom is an appropriate measure in light of the nature and severity of the improper conduct. See, e.g., *Norde* v. *Keane*, 294 F.3d 401, 413 (2d Cir. 2002). We now turn to the merits of the defendant's claims.

A

The defendant first claims that he was forcibly removed from the courtroom on February 3, 2004, without warning and for insufficient cause, in contravention of the general rule that before an unruly defendant may be removed from the courtroom, he first must be given a warning and an opportunity to agree to comport himself properly. We reject this claim because it is predicated on a faulty factual premise.

The record reflects that the trial court did not warn the defendant that he would be removed from the courtroom if he persisted in misbehaving for the simple reason that it was not the defendant's conduct that precipitated his removal. Rather, the trial court ordered the defendant's removal because the defendant had *requested* that he be permitted to leave the courtroom, which, although inadvisable, was the defendant's right. See, e.g., *State* v. *Drakeford*, supra, 202 Conn. 78–79 (accused waived right to be present at trial after court warned that trial would continue in absence of accused and accused nevertheless chose to leave); *Talton* v. *Warden*, 171 Conn. 378, 384, 370 A.2d 965 (1976) (accused may waive right to be present at trial). Specifically, after the trial court denied the defendant's request for a mistrial on the basis of Minnifield's testimony that the defendant had cut her with a knife, defense counsel informed the court that the defendant no longer wished to participate in the trial proceedings. At that time, the court asked the defendant whether he was certain of his decision, and the defendant responded that he was. On several occasions, the court explained to the defendant that the case would proceed without him and that he might be prejudiced because the jury would note his absence. The defendant responded that it did not matter because he already had been prejudiced by Minnifield's testimony. Although the defendant subsequently did express displeasure with his attorney and a desire to represent himself, he did so during a discussion in which he repeatedly assured the court that he no longer wanted to participate in the trial, and he never explicitly stated that he had changed his mind about absenting himself from the courtroom.[17] Although the

[17] Thus, at that time, it does not appear that the trial court perceived the defendant's request to dismiss counsel and represent himself to be a sincere one; in light of the defendant's repeated representations that he wished to absent himself from the trial, the court apparently did not take seriously the defendant's belated assertion—seemingly raised by the defendant in frustration over his colloquy with the court—that he wished to represent

record is replete with conduct by the defendant that posed a challenge to the patience of the court, there is nothing about the defendant's behavior immediately prior to his removal from the courtroom to suggest that the court ordered him removed for a reason other than his own request that he be permitted to leave. Indeed, in his brief to this court, the defendant asserts that his behavior in the moments leading up to his violent outburst had been courteous and respectful. In such circumstances, we can perceive of no reason—and the defendant has not suggested one—why the trial court should have deemed it necessary to warn him that he could be removed from the courtroom unless he refrained from engaging in disruptive conduct.[18]

*State* v. *Drakeford,* supra, 202 Conn. 75, supports our conclusion. In that case, the defendant, Teddy A. Drakeford, informed the trial court during jury selection that he wished to return to his jail cell. Id., 78. The court attempted to explain to him that the case would continue in his absence, but Drakeford refused to listen and continued to speak over the trial court's warnings. Id. Drakeford ultimately was removed from the courtroom. Id. Before jury selection resumed, however, the

himself. Indeed, the trial court presumably was aware of the fact that the defendant previously had indicated a desire to represent himself but never had followed through on the request. As we discuss more fully in part II of this opinion, however, for purposes of this appeal, we need not decide whether the trial court improperly failed to follow up on the defendant's statement that he wished to represent himself.

[18] The defendant asserts that he reacted violently to the marshals' attempts to remove him from the courtroom because he did not hear the trial court's order directing them to do so, and, as a result, he was taken by surprise when the marshals sought to effect his removal. This assertion has no bearing on our resolution of the defendant's claim because, by the time the defendant broke into a violent outburst, he had expressed his desire to absent himself from the courtroom after having been advised by the court and his counsel that the trial would nevertheless continue. Of course, even if it is true that the defendant could not hear the court's order—over his own expostulating—that fact cannot possibly justify the defendant's conduct in precipitating a violent altercation with the marshals.

trial court sent a sheriff to inform Drakeford that he was welcome to return to the courtroom if he conducted himself appropriately. Id., 78–79. Drakeford declined the invitation to return. Id., 79. On appeal from his murder conviction, Drakeford claimed that the trial court improperly had permitted jury selection to proceed without him. Id., 78. Specifically, Drakeford asserted that before resuming jury selection, the trial court should have applied the balancing test set forth in *United States* v. *Tortora*, 464 F.2d 1202, 1210 (2d Cir.), cert. denied sub nom. *Santoro* v. *United States*, 409 U.S. 1063, 93 S. Ct. 554, 34 L. Ed. 2d 516 (1972), for determining whether to suspend a trial in the event that a defendant, having been released on bail, fails to appear for a scheduled trial date.[19] *State* v. *Drakeford*, supra, 80. In rejecting this claim, we noted that, unlike the defendant in *Tortora*, whose failure to appear might have been attributable to any number of causes, Drakeford, by his conduct, voluntarily had opted to absent himself from the proceedings despite the trial court's warnings. See id. We stated that an accused cannot be permitted "to elect to pursue one course at trial and then . . . to insist on appeal that the course which he rejected at the trial be reopened to him . . . . [T]he protection which could have been obtained was plainly waived . . . . The court only followed the course which [the defendant] himself helped to chart . . . . *Johnson* v. *United States*, 318 U.S. 189, 201, 63 S. Ct. 549, 87 L. Ed. 704 (1943)." (Internal quotation marks omitted.) *State* v. *Drakeford*, supra, 81.

As in *Drakeford*, the trial court in the present case simply followed the course that the defendant himself

---

[19] As we explained in *Drakeford*, the test that the Second Circuit Court of Appeals adopted in *Tortora* "[e]ssentially . . . required the trial court to weigh the likelihood that trial could soon take place with the defendant present, the administrative problems of scheduling, and the burden on the government and its witnesses." *State* v. *Drakeford*, supra, 202 Conn. 80.

initiated when he asked to be allowed to leave the courtroom. At no time preceding his outburst did the defendant expressly state that he had changed his mind and wished to stay. The trial court had every reason, therefore, to take the defendant at his word and order the marshals to remove him. Moreover, even after the defendant had been removed from the courtroom, but before the trial had resumed, the defendant, through his attorney, informed the court that he "simply wanted no part of the trial" and "didn't even want to be brought into the building" anymore. The defendant, therefore, cannot prevail on his claim that he was removed from the courtroom on February 3, 2004, without warning or for insufficient cause. The defendant knowingly and voluntarily waived his right to be present on that day, and he is bound by that decision for purposes of this appeal.

B

The defendant next claims that the trial court improperly declined to allow him to return to the courtroom in accordance with his request on February 4, 2004, the day following his violent outburst. According to the defendant, the trial court's decision not to allow him back into the courtroom is inconsistent with the principle that an unruly defendant may reclaim his right to be present after he has been removed from the courtroom "as soon as [he] is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." *Illinois* v. *Allen*, supra, 397 U.S. 343. The defendant also contends that the trial court improperly relied on the opinion of Deputy Chief Marshal DiMauro that the defendant was a serious safety and security risk who, despite his representation to the contrary, was likely to disrupt the trial proceedings if permitted to return to the courtroom. We are not persuaded by the defendant's contention.

As we have indicated, the trial court initially granted the defendant's request to return to the courtroom on the morning of February 4, 2004, following his violent altercation with the marshals the day before, primarily on the basis of the defendant's apparent willingness to wear full body restraints and his promise, conveyed through DiMauro, to refrain from any further misconduct. Thereafter, however, DiMauro reported to the court that the defendant was behaving somewhat confrontationally toward the marshals, that he appeared agitated and that he was unapologetic about his behavior of the day before. DiMauro further stated that, in his opinion, the defendant wished to return to the courtroom only "to cause further discomfort" and to disrupt the proceedings. DiMauro also expressed concern for the safety of the marshals in light of the defendant's attitude and his threats against them the previous day. When the court asked defense counsel if he had anything to say, defense counsel replied that he did not. The court then denied the defendant's request, concluding that, on the basis of all that had transpired to that point, the defendant was very likely to continue to disrupt the trial proceedings if he were permitted to return to the courtroom and, further, that the defendant's presence at trial posed a security risk to everyone else in attendance.

We conclude that the trial court did not abuse its discretion in denying the defendant's request for permission to return to the courtroom. As we have explained, the defendant originally had refused to return to court in full body restraints but thereafter agreed to do so.[20] In other words, as between banishment from the courtroom and returning to the courtroom fully restrained, the defendant expressed a preference for

---

[20] The defendant does not claim that the requirement of full body restraints would have been unreasonable.

the latter.[21] Although it may be true that a court normally should defer to the preference of the accused in this regard, we are not persuaded that the court was required to do so in the present case. First, the court understandably was concerned that, due to the defendant's demonstrated propensity for violence, he posed a particular danger to the personnel responsible for transporting him to and from the courtroom. For those persons, even attempting to outfit the defendant with body restraints gave rise to a safety risk. Second, the court reasonably concluded that, under all of the circumstances, including the defendant's volatile temper, his habitual unwillingness to accept adverse court rulings, his confrontational attitude toward the marshals and his lack of contrition for his prior violent behavior, the defendant was very likely to engage in disruptive and obstreperous conduct if permitted to return to the courtroom. Finally, as the trial court observed, the need for and use of visible restraints undoubtedly would have prejudiced the defendant in the eyes of the jurors. Indeed, the United States Supreme Court has noted the "serious shortcomings" of the use of such restraints.[22] *Illinois* v. *Allen*, supra, 397 U.S. 345. In light of the

[21] In *Illinois* v. *Allen*, supra, 397 U.S. 337, the United States Supreme Court identified three constitutionally permissible courses of action that a trial court may take in dealing with an accused who insists on engaging in disruptive conduct: "(1) bind and gag him, thereby keeping him present; (2) cite him for contempt; [or] (3) take him out of the courtroom until he promises to conduct himself properly." Id., 344. Although the court emphasized that an accused may be prejudiced if he appears before the jury bound and gagged; id.; it also has "observed that in certain extreme situations, binding and gagging might possibly be the fairest and most reasonable way to handle a particularly obstreperous and disruptive defendant." (Internal quotation marks omitted.) *Holbrook* v. *Flynn*, 475 U.S. 560, 568, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986), quoting *Illinois* v. *Allen*, supra, 344.

[22] In this regard, we note that this court previously has indicated that, as between binding and gagging a disruptive defendant and the expulsion of such a defendant from the courtroom, the United States Supreme Court has expressed a general preference for the latter. *Sekou* v. *Warden*, 216 Conn. 678, 696, 583 A.2d 1277 (1990).

relevant considerations, in particular, the nature and severity of the defendant's misconduct, his refusal to acknowledge the impropriety of that misconduct and his stubbornly antagonistic attitude, we cannot say that the trial court acted unreasonably in concluding that the defendant should not be allowed to return to the courtroom.

We further conclude that the trial court's reliance on DiMauro in reaching its decision to exclude the defendant from the courtroom was not improper under the circumstances. Although it generally may be preferable for the court to question an accused personally to ascertain the sincerity of his or her willingness to refrain from any further disruptive conduct, in the present case, we cannot say that the court abused its broad discretion in dealing with the difficult situation that the defendant himself had created. First, it is readily apparent that the trial court's decision to deny the defendant permission to return to the courtroom was predicated largely on the court's own substantial dealings with and observations of the defendant. By virtue of the defendant's conduct in the courtroom itself, the trial court had firsthand knowledge of how difficult, explosive and violent the defendant could be.

Moreover, as we explained in *Sekou* v. *Warden*, 216 Conn. 678, 693, 583 A.2d 1277 (1990), it is not improper for a court to rely on a judicial marshal's advice in matters pertaining to courtroom security. In *Sekou*, the petitioner, Tshambi Sekou, claimed that the trial court improperly had delegated the decision to restrain him to a sheriff. Id., 691. In rejecting this claim, we stated that "[t]he court decided to restrain Sekou after consulting with the sheriff. Since it was presumably the sheriff, rather than the court, that ha[d] the experience in the keeping of prisoners and who must provide the guards and bear the major responsibility if untoward incidents occur, the court was entitled to rely heavily

upon the sheriff's advice." (Internal quotation marks omitted.) Id., 693. This reasoning applies equally to the trial court's reliance on the opinion of DiMauro, who, in addition to his responsibility for guarding the defendant and securing the courtroom, also was familiar with the defendant's violent predisposition, which his personnel had experienced firsthand on each of the two preceding court days.[23] Accordingly, under the circumstances, the trial court reasonably relied on DiMauro's advice as to whether it was prudent and safe to bring the defendant back into the courtroom.

Moreover, at no time did defense counsel object to the fact that the court had obtained certain information from DiMauro rather than from the defendant himself or to the fact that the court had solicited and relied on DiMauro's advice. It also is significant that defense counsel did not take exception either to the substance of DiMauro's statements regarding the defendant's state of mind or to DiMauro's opinion that the defendant was intent on disrupting the trial if permitted to return to the courtroom. Indeed, the fact that defense counsel interposed no objection to the procedure followed by the court—or, for that matter, to the court's ultimate decision to deny the defendant permission to return to the courtroom—strongly suggests that defense counsel did not believe that there was persuasive reason to quarrel with the information and advice that DiMauro had provided to the court. Under the circumstances,

[23] The court also had reason to give significant weight to DiMauro's evaluation of the situation because, as we have explained, DiMauro initially expressed the view that, despite the defendant's violent behavior, it would be acceptable, from a security perspective, to have the defendant return to the courtroom. Indeed, the court agreed to do so on the basis of DiMauro's recommendation. Although DiMauro changed his opinion about the advisability of permitting the defendant to return to the courtroom after speaking with him again, he explained why he had done so. Thus, the court had ample reason to conclude that DiMauro's advice was sound, evenhanded and temperate.

the absence of such objection, although, alone, not dispositive of the defendant's claim, provides additional support for our conclusion that the trial court acted reasonably in denying the defendant permission to return to the courtroom.

## II

The defendant next claims that the trial court improperly denied his request to represent himself in violation of his rights under the sixth amendment to the federal constitution and article first, § 8, of the state constitution. Specifically, the defendant maintains that, immediately prior to his removal from the courtroom on February 3, 2004, he sought to waive the right to counsel and to represent himself but that the trial court summarily and improperly denied his request. The defendant also claims that the trial court improperly failed to conduct an inquiry into his request pursuant to Practice Book § 44-3.[24] We conclude that the defendant forfeited his right to represent himself for the same reasons that he forfeited his right to be present at trial.

"Both the federal constitution and our state constitution afford a criminal defendant the right to [forgo] the assistance of counsel and to choose instead to represent himself or herself at trial. As a matter of federal constitu-

---

[24] Practice Book § 44-3 provides: "A defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself or herself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself;

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

"(4) Has been made aware of the dangers and disadvantages of self-representation."

tional law, the right to self-representation is premised on the structure of the Sixth Amendment, as well as in the English and colonial jurisprudence from which the Amendment emerged.[25] *Faretta* v. *California*, 422 U.S. 806, 818, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); see also *McKaskle* v. *Wiggins*, 465 U.S. 168, 174, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984); cf. *Gideon* v. *Wainwright*, 372 U.S. 335, [342] 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) ([making sixth amendment right to counsel applicable to states through due process clause of fourteenth amendment]). The Connecticut constitution is more explicit, stating directly that [i]n all criminal prosecutions, the accused shall have a right to be heard *by himself* and by counsel . . . . Conn. Const., art. I, § 8. We repeatedly have interpreted this language to establish an independent state constitutional guarantee of the right to self-representation. See *State* v. *Townsend*, 211 Conn. 215, 218, 558 A.2d 669 (1989) . . . ."[26] (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Day*, 233 Conn. 813, 820, 661 A.2d 539 (1995). Although "[w]e harbor no illusions that a defendant's decision to waive counsel and [to] proceed pro se generally will lead to anything other than disastrous consequences . . . values informing our constitutional structure teach that although [a defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of that respect for the individual which is the lifeblood of the law. *Illinois* v. *Allen*, [supra, 397 U.S. 350–51] (Brennan, J., concurring)." (Citation omitted; internal quotation marks omitted.) *State* v. *Webb*, 238 Conn. 389, 427–28, 680 A.2d 147 (1996).

[25] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."

[26] The defendant does not claim, however, that he is entitled to any greater rights under the state constitution than he is under the federal constitution. For purposes of this appeal, therefore, we treat the two provisions as providing the same level of protection.

"The constitutional right of self-representation depends, however, upon its invocation by the defendant in a clear and unequivocal manner." *State* v. *Carter*, 200 Conn. 607, 612, 513 A.2d 47 (1986). "In the absence of a clear and unequivocal assertion of the right to self-representation, a trial court has no independent obligation to inquire into the defendant's interest in representing himself, because the right of self-representation, unlike the right to counsel, is not a critical aspect of a fair trial . . . but instead affords protection to the defendant's interest in personal autonomy. . . . When a defendant's assertion of the right to self-representation is not clear and unequivocal, recognition of the right becomes a matter entrusted to the exercise of discretion by the trial court. . . . In the exercise of that discretion, the trial court must weigh into the balance its obligation to indulge in every reasonable presumption against waiver of the right to counsel." (Citations omitted; internal quotation marks omitted.) Id., 613–14. Finally, it is well established that a defendant, through his disruptive behavior, may forfeit his right to self-representation. See, e.g., *Faretta* v. *California*, supra, 422 U.S. 834 n.46; *State* v. *Johnson*, supra, 185 Conn. 179; *State* v. *Rose*, 73 Conn. App. 702, 708–709, 809 A.2d 534, cert. denied, 262 Conn. 927, 814 A.2d 382 (2002).

The state maintains that the defendant cannot prevail on his claim because he did not clearly and unequivocally assert his desire to represent himself. In support of its contention, the state maintains that, because the defendant's statement expressing a desire to represent himself was made at the conclusion of an extended colloquy with the court during which the defendant repeatedly stated that he wanted to absent himself from the trial, the court reasonably did not treat the defendant's request for self-representation as serious or sincere.[27] We need not decide whether the defendant's

---

[27] In the state's view, the present case falls into the category of cases in which the defendant fails to assert his right to self-representation in a clear

statements constituted a sufficiently plain and definite assertion of his desire to represent himself because, even if we assume, arguendo, that they did, he nevertheless cannot prevail on his claim. The defendant raised the issue of representing himself while forcibly resisting the efforts of the marshals who, acting at the court's direction, sought to remove him from the courtroom in accordance with his own desire to absent himself from the trial proceedings. Thereafter, the defendant refused to take responsibility for his conduct and persisted in his belief that he had been treated unfairly. As we explained in part I of this opinion, the trial court reasonably concluded that the defendant, by virtue of his demonstrated proclivity to react violently when court rulings and decisions did not go his way and his obstinate insistence on the propriety of his actions, could not be relied on to refrain from such outbursts in the future, and, therefore, by his conduct, the defendant had forfeited his right to be present in court during trial. For all the same reasons, the defendant also forfeited his right to represent himself.[28] See *Faretta* v.

___

and unequivocal manner. See, e.g., *Burton* v. *Collins*, 937 F.2d 131, 133–34 (5th Cir.) (trial court reasonably interpreted defendant's question as to whether he could represent himself as mere inquiry about alternatives available to him in light of trial court's refusal to appoint substitute counsel), cert. denied, 502 U.S. 1006, 112 S. Ct. 642, 116 L. Ed. 2d 660 (1991); *State* v. *Carter*, supra, 200 Conn. 611, 614 (statement by defendant that he would need to represent himself following dispute with appointed counsel was not, without more, sufficient to constitute clear and unequivocal assertion of right to self-representation).

[28] The defendant suggests that, because his altercation with the marshals occurred after the trial court improperly had rejected his request for permission to represent himself—indeed, the defendant maintains that the altercation was triggered by the trial court's refusal to allow him to proceed pro se—it is unfair to rely on the defendant's conduct in connection with that altercation for the purpose of determining whether he was entitled to represent himself. On the contrary, even if the trial court incorrectly rejected the defendant's request that he be permitted to represent himself, the defendant's extreme misconduct was wholly inappropriate and unjustified. In light of the serious nature of that misconduct, the court acted well within its discretion in considering it for the purpose of determining, thereafter, whether to allow the defendant to return to the courtroom.

*California*, supra, 422 U.S. 834 n.46 ("the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct"); *State* v. *Johnson*, supra, 185 Conn. 179 ("it was the defendant himself, through his disruptive behavior, who forfeited his right to self-representation").

## III

The defendant next claims that the trial court improperly denied his motion to suppress his written confession and the murder weapon that was recovered after he had given the confession to the police. With respect to the motion to suppress his confession, the defendant contends that the state failed to establish that he had been advised of his *Miranda*[29] rights prior to giving his statement and that he did not knowingly and voluntarily waive those rights. With respect to the motion to suppress the murder weapon, the defendant claims that its seizure was the product of his unlawful confession. We reject the defendant's claims.

The following facts are relevant to our resolution of this issue. Prior to trial, the court held a hearing on the defendant's motion to suppress. At that hearing, the state adduced testimony from Scott Stevenson, a detective with the Waterbury police department. Stevenson testified that, on June 27, 2001, he accompanied a group of Waterbury police officers to the defendant's home in Hartford to execute an arrest warrant for the defendant and to execute a search warrant that the police had obtained for the defendant's home. The officers arrived at the defendant's home between 9 and 10 a.m., placed the defendant under arrest and proceeded to execute the search warrant. When they had finished searching the defendant's home, the officers returned with the defendant to the Waterbury police department,

---

[29] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

arriving sometime between 12 and 1 p.m. At that time, the defendant was placed in an interview room. Detective Lieutenant Neil O'Leary, Stevenson's supervisor, directed Stevenson to stay with the defendant because there was no lock on the interview room door. Stevenson testified that, although he had been instructed to remain with the defendant, he had not been directed to take any statements from him or to ask him any questions.[30]

Because it was lunchtime, Stevenson asked the defendant if he was hungry, and, when the defendant responded that he was, Stevenson ordered food for both of them. During lunch, the two men discussed various topics, including the defendant's children and religion. Stevenson testified that nothing about the defendant's behavior or demeanor suggested that he was under the influence of drugs or alcohol, that the two men had a good rapport and that they were on a first name basis. Stevenson further testified that, during the ninety minutes or so that it took for the food to arrive and to finish lunch, the subject of the victim's murder did not come up. Stevenson testified that, shortly after lunch, however, the defendant spontaneously stated something "along the lines of, I didn't kill anybody." According to Stevenson, he ignored the comment, but the defendant stated shortly thereafter, "I know you guys think it's about the girl." Stevenson then asked the defendant if he had known the victim. The defendant responded by placing his head in his hands and stating, "[H]e did not deserve to have happen what I did to him." Stevenson left the room to inform O'Leary about the defendant's statement. O'Leary asked Stevenson whether the defendant had been advised of his rights and, upon learning that he had not, instructed Stevenson to do so immediately and then to ask the

---

[30] Stevenson explained that he only recently had been assigned to the detective bureau and that he had not been assigned to the victim's murder investigation.

defendant if he would be willing to speak to Stevenson about the victim's murder.

Stevenson obtained an advice of rights card, returned to the interview room and read the defendant his rights. He then asked the defendant if he understood his rights, and the defendant responded that he did. At Stevenson's request, the defendant signed and dated the advice of rights card. Thereafter, the defendant gave a detailed confession to Stevenson explaining how he had shot and killed the victim. John Kennelly, a senior detective with the Waterbury police department, was present throughout the confession and witnessed it. At the conclusion of the defendant's oral statement, Stevenson informed the defendant that he wished to reduce the defendant's oral confession to a written statement, to which the defendant did not object. Before doing so, however, Stevenson asked the defendant to read aloud from a voluntary statement rights form and initial each line, which the defendant did. Stevenson then proceeded to type the defendant's confession while the defendant looked on while sitting next to Stevenson. When Stevenson finished typing the statement, he handed it to the defendant to read. After the defendant finished reading the statement, he signed and initialed it.

In confessing to the murder, the defendant told Stevenson that he had disassembled the murder weapon and had thrown the pieces into the woods behind a housing project in Waterbury. Stevenson testified that, several hours after the defendant confessed, as Stevenson was transporting the defendant from the holding cell to the booking station, the defendant spontaneously stated, "[A]bout the gun . . . I'm not going to send you on a wild goose chase. Find my brother in Hartford. You're going to find the gun." The next morning, Stevenson located the defendant's brother, Martin Jones (Martin), at his girlfriend's house in Hartford, but Martin claimed to know nothing about the gun. Stevenson then called the detective bureau of the Waterbury police

department and asked that the defendant be brought to the telephone to speak to Martin. After speaking with the defendant, Martin took Stevenson to the murder weapon, which the defendant had hidden behind an abandoned house on Zion Street in Hartford.

The defendant also testified at the suppression hearing. His testimony differed in material respects from the testimony that had been adduced by the state. Specifically, the defendant testified that, at the time of his arrest, he had just returned from a night of heavy drinking and drug use, and that he was intoxicated when the police arrested him. The defendant further testified that O'Leary and Stevenson had commenced questioning him about the victim's murder as soon as he arrived at the Waterbury police department and that neither one ever had advised him of his rights. The defendant also testified that, during the interview, he had asked to speak to an attorney but that his request was denied. When asked about his signed confession, the defendant testified that he had signed the statement only because Stevenson had indicated to him that it would be helpful to him to do so. The defendant denied that the signature on the advice of rights card was his signature, and he further testified that, although he had signed the voluntary statement rights form, he most likely had done so on a different day in conjunction with a different investigation.

The trial court denied the defendant's motion to suppress his written confession, concluding that the confession had been given knowingly and voluntarily after the defendant had been fully advised of his rights.[31] To the extent that the defendant's testimony differed from that of the state's witnesses, the trial court expressly credited the latter. With respect to the defendant's

---

[31] We note that the state did not seek to introduce into evidence any of the statements that the defendant had made to Stevenson before Stevenson had advised the defendant of his rights.

motion to suppress the murder weapon as the product of an unlawful confession, the trial court found that the defendant's statement to Stevenson explaining where the weapon could be found had been given voluntarily after the defendant was advised of his rights.

"As an initial matter, we note that [o]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's [ruling] . . . ." (Internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 92, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006).

Furthermore, "[t]o be valid, a waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. . . . In considering the validity of a waiver, we look to the totality of the circumstances of the claimed waiver. . . . Although the issue of whether there has been a knowing and voluntary waiver is ultimately factual, the usual deference to fact-finding by the trial court is qualified in this area by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Azukas*, 278 Conn. 267, 288, 897 A.2d 554 (2006).

The defendant does not dispute that the evidence adduced by the state, if credited, was sufficient to establish that he confessed to the murder and revealed the whereabouts of the murder weapon only after a know-

ing and voluntary waiver of his rights. The defendant claims, rather, that this court should reject the finding of the trial court crediting the state's evidence because, he asserts, a scrupulous review of the record reveals that his testimony concerning the validity of his inculpatory statements is more credible than the testimony offered by the state. We reject the defendant's claim. Notwithstanding this court's responsibility to examine the record carefully to ensure that the trial court's finding of a knowing and voluntary waiver is supported by substantial evidence, it is not the function of this court to second guess the trial court's reasoned credibility determinations or otherwise to retry the facts. The record of the suppression hearing amply supports the trial court's finding that the defendant was fully advised of his rights and that he knowingly and voluntarily waived those rights before confessing to the murder and revealing the location of the murder weapon.[32]

The judgment is affirmed.

In this opinion the other justices concurred.

[32] The defendant also claims that his confession was obtained unlawfully because, under General Statutes § 54-1d, when an arrest is made pursuant to a warrant, "the defendant must be presented in the geographical area where the arrest was made." In the present case, the defendant was arrested in Hartford and presented for arraignment in Waterbury. We do not address this claim because the defendant failed to raise it in the trial court. See Practice Book § 60-5 ("[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial"). The defendant nevertheless contends that we should review the claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989) (prescribing standard for review of unpreserved constitutional claims), or under the plain error doctrine. See, e.g., *State* v. *D'Antonio*, 274 Conn. 658, 669, 877 A.2d 696 (2005) ("The plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under [the] plain error [doctrine] unless [he] has demonstrated that the failure to grant relief will result in manifest injustice." [Internal quotation marks omitted.]). The defendant's claim, however, is not of constitutional magnitude, and he has failed to explain why the claim merits plain error review. We therefore decline the defendant's invitation to consider it.