STATE OF CONNECTICUT *v.* JOHNNY ORTIZ
(AC 27681)

Flynn, C. J., and Bishop and McLachlan, Js.

Argued January 18—officially released May 29, 2007

*Elizabeth M. Inkster*, senior assistant public defender, with whom, on the brief, were *Jocelyn Griffin* and *David Gettler*, certified legal interns, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom were *John F. Fahey*, senior assistant state's attorney, and, on the brief, *James E. Thomas*, state's attorney, for the appellee (state).

*Opinion*

McLACHLAN, J. The defendant, Johnny Ortiz, appeals from the judgments of conviction, following a jury trial, of felony murder in violation of General Statutes § 53a-54c, manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3), burglary in the first degree in violation of General Statutes § 53a-101 (a) (2), kidnapping in the second degree in violation of General Statutes § 53a-94, and larceny in the third degree in violation of General Statutes §§ 53a-124 (a) (1) and 53a-8. The defendant also appeals from the judgment, following a trial to the court, revoking his

probation.[1] On appeal, the defendant claims that the trial court improperly (1) denied his motion to suppress incriminating statements that he made to police because the state failed to prove that the statements were given with a knowing, voluntary and intelligent waiver of his *Miranda*[2] rights or that his confession was voluntary, (2) admitted hearsay testimony in violation of his rights to confrontation and due process and (3) instructed the jury that it could find him guilty of felony murder on the basis of the underlying offenses of "simple robbery," "simple burglary" and "simple kidnapping." We affirm the judgments of the trial court.

The following facts and procedural history are relevant to our resolution of the defendant's claims on appeal. On February 7, 2003, at approximately 7:30 p.m., the police discovered the body of Anzo Arnini in his home in West Hartford, after responding to a call to conduct a welfare check.[3] Arnini, who was approximately eighty years old at the time of his death, was discovered lying face down on his kitchen floor, naked from the waist down, with his hands tied behind his back and with a necktie and a bathrobe belt tied around his mouth. The medical examiner determined that the cause of Arnini's death was positional asphyxia.[4]

On February 8, 2003, the police located Arnini's truck in a parking lot in Hartford. On the basis of evidence

[1] The jury found the defendant not guilty on charges of robbery in the first degree, kidnapping in the first degree and conspiracy to commit robbery in the first degree. The defendant received a total effective sentence of sixty years and six months imprisonment.

[2] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] Typically, the police conduct a welfare check on the status of an elderly person if, for example, a family member is unable to get in touch with that person.

[4] According to the medical examiner, positional asphyxia occurs when the body is in a position in which the lungs can no longer operate in the normal fashion and there is not a proper exchange of air. After a while, Arnini became exhausted and could no longer breathe, which caused his death.

gathered from both Arnini's home and the area where the truck was located, the police were able to link Kimberly Lebel to the crime scene. During the investigation, the police also arrested a witness, Jorge Santos, who implicated the defendant and Lebel. At trial, Santos testified that on the night of February 4, 2003, the defendant and Lebel were with Santos at an apartment, and they discussed the crime. According to Santos, Lebel stated that she and the defendant had robbed an "old man" in West Hartford and had stabbed him and that he had died.

The defendant was arrested on the evening of February 11, 2003. According to West Hartford police Detective Paul Melanson, while the defendant was in custody, he told the police that on the night of the incident, he and Lebel went to Arnini's house. They planned that Lebel, a stripper, would dance naked for Arnini, and Arnini would pay her $60 in exchange for these services. The defendant stated to the police that he waited outside on the sidewalk while Lebel was inside with Arnini. At some point, the defendant looked through the front window and observed Arnini touching Lebel, which the defendant indicated was not part of the deal. The defendant ran in the side entrance of the house, and a physical confrontation between the defendant and Arnini ensued. The defendant stated that Arnini was going for the cabinets in the kitchen and that he thought that Arnini was reaching for a gun. The defendant stated that he got Arnini down and sat on Arnini's chest. The defendant then gagged Arnini with the belt of Arnini's bathrobe and a cloth tie, because Arnini was yelling so much.

During this time, Arnini went into convulsions and then stopped moving. The defendant thought, however, that Arnini might be pretending to be unconscious, so he tied his hands behind his back with a telephone cord. The defendant and Lebel then took the keys to

Arnini's truck, got into the truck and drove to Hartford to purchase some heroin and crack cocaine.

The defendant provided the police with written statements to this effect. He subsequently filed a motion to suppress his statements. On May 6, 2004, the court held a hearing on the defendant's motion to suppress. During the hearing, the court heard testimony from West Hartford police Detectives Melanson, Frank Fallon and Robert Moylan. An attorney, Gerald Klein, and the defendant also testified. On October 22, 2004, the court issued a memorandum of decision denying the motion to suppress, and the contents of the defendant's written statements were read to the jury during his trial.

I

ADMISSIBILITY OF CONFESSION

The defendant's claim that the court improperly denied the motion to suppress his statements to the police is twofold. First, the defendant claims that the court improperly concluded that he voluntarily, knowingly and intelligently waived his *Miranda* rights. Within this claim, the defendant argues (1) that the court improperly concluded that the police properly advised him of the *Miranda* warnings and (2) that his heroin withdrawal rendered his waiver involuntary. Second, the defendant claims that the court improperly concluded that his confession was voluntary.

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . Under the clearly

erroneous standard, [w]e cannot retry the facts or pass on the credibility of the witnesses." (Citation omitted; internal quotation marks omitted.) *State* v. *Stephenson*, 99 Conn. App. 591, 595–96, 915 A.2d 327 (2007).

The following additional facts, established at the May 6, 2004 suppression hearing, are relevant to our resolution of the defendant's claim. On February 11, 2003, at approximately 7 p.m., members of the Hartford police department arrested the defendant on an outstanding West Hartford warrant, which had been obtained for the larceny of Arnini's truck. The defendant was transported to a police substation and was met by four West Hartford detectives at approximately 8 p.m. Two of these detectives, Fallon and Detective Schiffer,[5] took the defendant into custody and placed him in the rear of their cruiser to transport him to the West Hartford police department. The other two detectives, Melanson and Moylan, followed in their police vehicle.

En route, Melanson radioed the unit ahead and requested that Fallon advise the defendant of his *Miranda* rights and that the lead vehicle proceed to Arnini's home. Fallon, who was seated in the right front passenger seat, turned the dome light on in the vehicle and told the defendant that he was going to advise him of his *Miranda* rights. The defendant indicated that he understood his rights and that "he had been arrested over thirty times and had heard his *Miranda* rights numerous times." Fallon then advised the defendant of his rights.

The police cars stopped at Arnini's home, and Melanson exited his vehicle and approached the defendant in the other vehicle. During a brief conversation, Melanson asked the defendant if he recognized the house, and the defendant answered, "yes."

---

[5] The full name of Detective Schiffer is not apparent from the record.

Thereafter, both police vehicles proceeded to the West Hartford police department, and the defendant was escorted to the third floor conference room in the detective division, arriving at approximately 9 p.m. At that time, the defendant did not indicate that he was unwilling to speak to the officers or request to speak to an attorney. Fallon testified that the defendant did not appear to have been drinking or appear to be intoxicated and "seemed to be pretty composed." Although Melanson indicated in one response that the defendant appeared to be under the influence of either drugs or alcohol, he then clarified that response by indicating that "[the defendant's] behaviors . . . weren't unordinary behaviors that you would picture somebody under the influence, like, of alcohol, who was stumbling or something of that sort. There was none of that. Moreover, it was his discussing his heroin problem and, through training and experience, knowing that somebody who doesn't maintain their heroin gets worse over time; in other words, sick, and he didn't appear sick in any sort of way or anything of that sort. So, we kind of—you know, him telling us that he had a heroin problem and he had a drink of alcohol. But his actual appearance and behavior were relatively normal." During the interview, the defendant appeared to deteriorate slightly, and he advised the officers that he was a heroin addict and was suffering from withdrawal symptoms. At that time, the defendant did not indicate, however, that he needed any medical attention.

For over a period of about one and one-half hours, beginning at approximately 9 p.m., the detectives spoke with the defendant about general matters, including Lebel. The police did not question the defendant about the murder during this initial interrogation. Also during this period, the police provided the defendant with breaks for food, drink and a bathroom visit. At approximately 11:30 p.m., the interview turned to the night of the incident.

At 2:30 a.m., Melanson decided to reduce the conversation to writing. Utilizing a rights waiver form, Melanson advised the defendant of his *Miranda* rights again and explained the contents of the form to the defendant. At about this time, the police determined that the defendant was thirty-one years of age, he had completed the tenth grade at Hartford High School and could read and write.

As Melanson went over the acknowledgement and waiver of rights form with the defendant, he read each numbered paragraph to the defendant, and the defendant initialed each, indicating that he understood the contents. The defendant read aloud the waiver portion of the form and then signed the form. Afterward, from approximately 2:40 a.m. until 3:20 a.m., the defendant provided a written statement to the police, with the assistance of Melanson.[6] During the entire interview (from approximately 9 p.m. to 2:40 a.m.), the defendant did not indicate that he was tired or wanted to sleep, that he wanted to terminate questioning or that he wanted to speak to an attorney. Moreover, at that time, it did not appear to the officers that the defendant's condition had deteriorated significantly or that he was in need of medical attention.

Shortly after 9 a.m., on the following morning, an attorney, Klein, who had been in touch with the defendant's family and who had represented the defendant previously, contacted the West Hartford police department and requested to speak to the defendant. At approximately 9:30 a.m., the police advised the defendant that Klein had called and inquired whether the

---

[6] With regard to the preparation of the statement, Melanson described the process as follows: "What we do is, while taking the statement, it's read out loud, it's on the computer screen, and we're actually writing the document with him, going over word for word on it. After the document's completed, that it has been typewritten, it's printed out, given [to] him for review, and then he reads it."

defendant would like to contact Klein. The defendant responded that he had confessed already and that he did not feel like talking to Klein. Moylan then escorted the defendant from the upstairs holding area down to his office to provide the defendant with the opportunity to contact Klein if the defendant so desired and in order to conduct a further interview of the defendant.

At approximately 9:30 a.m., or shortly thereafter, Melanson went to see the defendant. Melanson again reviewed with the defendant the waiver of rights form that the defendant had executed earlier and, relevant to the right to an attorney, indicated to the defendant, "you've been told that attorney Klein has [been] contacted . . . and wished to speak with you . . . ." The defendant responded, "I've already confessed, so there's nothing to talk about."

Melanson then reviewed again the advisement provided in the form with the defendant. After this advisement, the defendant indicated that he would be willing to be interviewed further concerning the incident under investigation. The defendant made no request to call or to meet with an attorney. Melanson and Moylan then conducted another interview from 10:13 a.m. to 10:40 a.m., which was also reduced to a written statement using the same method of preparation used to obtain the first statement. This statement, to which the defendant affixed his signature and which was submitted under oath, concluded, "I want to say that . . . Moylan and . . . Melanson treated me with respect, and they gave me pizza, cheeseburger, sodas and chicken fried rice."

After the second written statement was completed, the defendant spoke further with the officers, and then Melanson allowed the defendant to call his brother. After the conversation, the defendant said his brother encouraged him to call Klein. Melanson retrieved the telephone number for Klein and gave it to the defendant

in order to facilitate the contact. The defendant did not place the call and stated words to the effect of "[w]hat's [Klein] going to do for me now?" At that time, the defendant left the note with Klein's number written thereon on Moylan's desk, and he was returned to the holding cell. At approximately 4 p.m., on February 12, 2003, the defendant was taken to John Dempsey Hospital in Farmington in order to have evidence collected from him and to receive treatment for his heroin withdrawal symptoms.

## A

### *Miranda* Waiver

The defendant first claims that the court improperly concluded that he waived his *Miranda* rights. "To be valid, a waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. . . . In considering the validity of a waiver, we look to the totality of the circumstances of the claimed waiver. . . . Although the issue of whether there has been a knowing and voluntary waiver is ultimately factual, the usual deference to fact-finding by the trial court is qualified in this area by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Azukas*, 278 Conn. 267, 288, 897 A.2d 554 (2006).

### 1

### Administration of *Miranda* Warnings

The defendant argues that the court improperly concluded that he was advised properly of the *Miranda* warnings. He claims that none of the officers read him the *Miranda* rights in a satisfactory manner. According

to the defendant, this rendered his subsequent waiver and confession invalid.

An individual is entitled to be advised of his *Miranda* rights prior to any custodial interrogation in order to protect his privilege against self-incrimination and to ensure that all confessions used against him are knowingly and voluntarily made. *State* v. *Ledbetter*, 41 Conn. App. 391, 395, 676 A.2d 409 (1996), aff'd, 240 Conn. 317, 692 A.2d 713 (1997). "The primary purpose of the *Miranda* warnings is to ensure that an accused is aware of the constitutional right to remain silent before making statements to the police. . . . Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . The defendant bears the burden of proving custodial interrogation." (Citations omitted; internal quotation marks omitted.) *State* v. *Betances*, 265 Conn. 493, 500, 828 A.2d 1248 (2003).

Here, there is no dispute that the defendant was subjected to custodial interrogation. Rather, the defendant contends that the advisement was flawed because of inconsistencies in Fallon's testimony as to whether he advised the defendant that the defendant had a right to see an attorney *during* questioning rather than *before* questioning. The defendant also contests the court's conclusion that the defendant was advised of his rights by Melanson and Moylan, who, according to the defendant, merely handed the defendant the forms with the rights printed on them.

In its memorandum of decision, the court expressly found that the *Miranda* rights were given to the defendant on three occasions during the time period at issue: (1) on February 11, 2003, in the police cruiser before the questioning by Melanson, (2) on February 12, 2003,

at the police station at 2:40 a.m. and (3) on February 12, 2003, at 9:30 a.m. These factual findings were based on direct testimony from the officers at the hearing that they had advised the defendant of his rights, which the court found credible.[7] It is not the province of this court to retry facts or make credibility determinations related to the evidence presented to the trial court at a suppression hearing. See *State* v. *Williams*, 169 Conn. 322, 325, 363 A.2d 72 (1975). Upon review of the record, it is clear that the police officers' testimony adequately supported the court's determinations, as there was direct testimony from both Fallon[8] and Melanson regarding the three instances cited by the court. Thus, we conclude that the court's finding that the defendant was adequately apprised of his *Miranda* rights is supported by substantial evidence.

2

Voluntariness of *Miranda* Waiver

The defendant's second argument is that his waiver was involuntary because he was suffering from heroin withdrawal at the time that he waived his *Miranda* rights. The defendant argues that Melanson's testimony that the defendant was "maybe rubbing his stomach a little bit like his stomach was bothering him a little bit" coupled with the fact that the defendant was taken subsequently to the hospital and treated for heroin withdrawal clearly indicated that the defendant was suffering from withdrawal symptoms. The defendant argues

---

[7] In its memorandum of decision, the court noted that the defendant's version of events was substantially at odds with the testimony of the officers. The court chose to credit the testimony of the officers and not the defendant. Such a determination is entirely within the province of the trial court. See *State* v. *Hawthorne*, 176 Conn. 367, 371, 407 A.2d 1001 (1978).

[8] Although Fallon testified that he had advised the defendant that he had a right to consult an attorney *before* questioning and did not expressly state that the defendant had a right to have an attorney present *during* questioning, any potential defect that this may have caused was cured by the subsequent warnings provided to the defendant. See *State* v. *Gray*, 200 Conn. 523, 531, 512 A.2d 217, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986).

that the court's conclusion that he was not experiencing withdrawal symptoms that would affect his ability to waive his *Miranda* rights voluntarily and intelligently is not supported by the facts.

Upon examination of the record, we conclude that the court's factual findings are supported by substantial evidence. Specifically, the court credited Fallon's testimony that the defendant did not appear intoxicated and seemed to be composed. Melanson also indicated that he had experience and training observing persons suffering from heroin withdrawal and that the defendant did not appear to be sick in any sort of way. Moreover, the record supports the court's finding that the defendant did not, at that time, indicate that he needed any medical attention. Although the defendant testified that he was experiencing withdrawal, the court properly chose to discredit his testimony, which conflicted with that of the officers. See *State* v. *Hawthorne*, 176 Conn. 367, 371, 407 A.2d 1001 (1978). Finally, during the interrogation, the defendant was provided with breaks for food, water and to use the bathroom. On the basis of the record, we conclude that the court did not determine improperly that the defendant made a valid waiver of his *Miranda* rights on the basis of the totality of the circumstances.

B

Voluntariness of Confession

The defendant's second argument within the penumbra of his suppression claim is that, independent of any *Miranda* issues, the court improperly determined that his confession was voluntary in violation of his right to due process. At the outset, we note that the state bears the burden of persuasion on the issue of voluntariness, and it must convince the trial court by a preponderance of the evidence that the confession sought to be admitted was voluntarily given. *State* v. *James*, 237

Conn. 390, 425–26, 678 A.2d 1338 (1996).[9] Our Supreme Court has stated: "The standard for voluntariness of a *Miranda* waiver is the same as the standard for voluntariness of a confession. . . . Additionally, we have noted: Irrespective of *Miranda* . . . any use in a criminal trial of an involuntary confession is a denial of due process of law. . . . In order to be voluntary a confession must be the product of an essentially free and unconstrained choice by the maker. . . . [T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined. . . . Furthermore, the scope of review is plenary on the ultimate question of voluntariness, but the trial court's findings regarding the circumstances surrounding the defendant's questioning and confession are findings of fact that will not be overturned unless they are clearly erroneous." (Citations omitted; internal quotation marks omitted.) *State* v. *Azukas*, supra, 278 Conn. 289–90.

The defendant claims that the police coerced his confession by offering him medical treatment for his heroin withdrawal only on the condition that he cooperated in providing a confession. Factually, the defendant relies on his testimony at the suppression hearing to support this proposition. Upon review of the record, we conclude that the court's factual determinations supporting the finding that the defendant's confession was voluntary are not clearly erroneous. As discussed in part I A, the defendant made a knowing, voluntary and intelligent waiver of his rights, and although he

[9] The defendant requests that we overrule Supreme Court precedent set forth in *State* v. *James*, supra, 237 Conn. 426, with respect to the state's burden of proof to demonstrate the voluntariness of a confession. The constitutional principles articulated in *James* have since been reaffirmed by our Supreme Court; see *State* v. *Lawrence*, 282 Conn. 141, 146, 920 A.2d 236 (2007); and, therefore, our review is unnecessary.

may have been suffering from heroin addiction, the officers made no significant observations on which the court could conclude, on the basis of the totality of the circumstances, that the defendant's confession was involuntary because of his drug use. See *State* v. *Stankowski*, 184 Conn. 121, 134, 439 A.2d 918 ("[T]he use of drugs òr the ingestion of alcoholic beverages does not in and of itself render a subsequent admission inadmissible. . . . It is one factor to be considered in determining the voluntariness of a statement." [Citations omitted; internal quotation marks omitted.]), cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981).

Further, there was no evidence of police tactics that overbore the defendant's will to resist. The police gave the defendant breaks for food, water and to use the bathroom and gave him several opportunities to contact a lawyer. Moreover, the court expressly discredited the testimony of the defendant, and we find nothing in the record to undermine its discretion to determine that the defendant's testimony was not credible. As such, the defendant's bald assertion that the police coerced him is without merit. Accordingly, we conclude that the factual findings of the trial court were not clearly erroneous and that the defendant's confession was freely given and not the result of overbearing police conduct. See *State* v. *Azukas*, supra, 278 Conn. 291.

## II

## ADMISSIBILITY OF LEBEL'S STATEMENT

The defendant next claims that the court improperly admitted hearsay testimony at his trial in violation of his rights to confrontation and due process. Specifically, the defendant argues that the court improperly admitted a statement of an alleged coconspirator without making

a threshold finding of a conspiracy.[10] The state argues that we should not review this claim because it was not distinctly raised before the trial court. The state further argues that the statement was admitted properly as a statement of a coconspirator or, alternatively, as an adoptive admission. Finally, the state argues that even if the admission of the evidence was improper, any error was harmless. We agree with the state that the issue was not preserved adequately before the trial court and that the statement properly could have been admitted into evidence as an adoptive admission. Accordingly, we sustain the ruling of the trial court.

"[O]ur standard of review for the trial court's evidentiary rulings depends on whether the claimed error is of constitutional magnitude. The court's ruling as to the nonhearsay character of the evidence is reviewed under a deferential abuse of discretion standard. . . . [I]f an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. . . . When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Citation omitted; internal quotation marks omitted.) *State* v. *George J.*, 280 Conn. 551, 592, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007). "[W]ith respect to the question of whether an out-of-court statement possesses sufficient indicia of credibility in order to satisfy the requirements of the confrontation clause, our review is plenary." *State* v.

---

[10] "In order to invoke the coconspirator exception to the hearsay rule, [t]here must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made during the course and in furtherance of the conspiracy. . . . The court must make its preliminary determination[s] by a fair preponderance of the evidence . . . ." (Internal quotation marks omitted.) *State* v. *Peeler*, 267 Conn. 611, 628, 841 A.2d 181 (2004).

*Pierre*, 277 Conn. 42, 74, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006).

At trial, Lebel did not testify. The state called Santos, who testified about inculpatory statements that Lebel made in his presence while she and the defendant were in an apartment on the night of February 4, 2003. According to Santos, Lebel stated that she and the defendant "had robbed some old man in West Hartford and that he had died or something."[11] Santos also testified that Lebel stated that they had stabbed the old man, "or . . . something like that." On cross-examination, Santos admitted that he had been using crack cocaine and alcohol on the day that the statements were made to him.

After the state began to elicit this testimony from Santos about Lebel's statements, defense counsel objected on the ground that the state was soliciting hearsay testimony. The state responded that the statement was admissible as a coconspirator's statement, and the court overruled the objection, allowing Santos to testify about what Lebel had stated in the apartment. At this point, the state concluded its direct examination of Santos, and the court called a recess.

During the recess and outside the presence of the jury, defense counsel renewed the objection, stating, "Your Honor, I would object to the witness' statements as hearsay, specifically, the statement that 'they told me they robbed an old man and he died.' *There is no conspiracy charge as to the robbery count, the felony murder count or the manslaughter charge.*" (Emphasis added.) During a subsequent exchange, the court noted

[11] It is unclear from the testimony of Santos to whom exactly Lebel made the statements. He first testified that Lebel made the statements during a conversation with Santos; however, he later testified that Lebel made the statements to the owner of the apartment while Santos was standing on the other side of the room.

that there was a conspiracy charge related to the robbery and stated that the felony murder charge, by its very nature, is accessorial. Defense counsel further argued that the statement was inadmissible as to the robbery count, and the court overruled the defendant's objection.

With respect to the issue of reviewability, the state argues that the defendant's claim on appeal comprises an attack on the factual circumstances surrounding the admissibility of the evidence (i.e., that the facts do not support that the statement was made in furtherance of a conspiracy and that the circumstances indicate that the statement was unreliable), while the defendant's objection at trial related only to whether there was a legal nexus between the crimes charged and the theory of admissibility (i.e., that there was no relevant *charge* of conspiracy as to the felony murder charge, and, therefore, the coconspirator exception to the rule against hearsay was inapplicable). In other words, the state argues that the defendant's claim on appeal is a factual challenge to the foundation for admitting the evidence, which was not raised specifically before the trial court. We agree.

"[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted. . . .

"These requirements are not simply formalities. They serve to alert the trial court to potential error while

there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush." (Internal quotation marks omitted.) *State* v. *Calabrese*, 279 Conn. 393, 408 n.18, 902 A.2d 1044 (2006).

Here, the defendant made a general objection to the court's admission of the evidence as hearsay. Although the defendant's follow-up objection stated the ground that the statement was not permitted as a statement by a coconspirator, the real purpose of that objection related only to the fact that there was no relevant *charge* of conspiracy and not that there was insufficient evidence to determine that the statements were made in furtherance of a conspiracy or that the statements were unreliable. We conclude that this objection was insufficient to apprise the trial court of the precise nature of the objection that the defendant now claims on appeal. See *State* v. *Cabral*, 275 Conn. 514, 531, 881 A.2d 247, cert. denied, 546 U.S. 1048, 126 S. Ct. 773, 163 L. Ed. 2d 600 (2005). We further conclude, therefore, that the defendant did not properly preserve the record for appeal and that the record is inadequate to review the alleged claim of error. See id.; see also *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

Because the defendant's claim raises serious constitutional concerns, we choose to address the alternate ground for affirmance raised by the state. This court is free to sustain a ruling on a different basis from that relied on by the trial court. *State* v. *John*, 210 Conn. 652, 679–80, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989). Even if we assume arguendo that the record had been preserved adequately and that there was insufficient evidence that Lebel's statement had been made in furtherance of the

conspiracy,[12] we agree with the state that the statement would still have been admissible as an adoptive admission.

An adoptive admission is a statement offered against a party, which that party has adopted or approved. See Conn. Code Evid. § 8-3 (1) (B). Thus, "[w]hen a party's conduct indicates that the party assents to or adopts a statement made by another person, the statement is admissible against the party. . . . Specifically, [w]here hearsay accusations are sought to be introduced as evidence against a defendant in a criminal proceeding on grounds that the hearsay was adopted by the defendant . . . the trial court must first determine that the asserted adoptive admission be manifested by conduct or statements which are unequivocal, positive, and definite in nature, clearly showing that in fact [the] defendant intended to adopt the hearsay statements as his own. . . . Generally, statements made within the accused's hearing, which are relevant and material, to which he makes no reply, may be given in evidence as

[12] Despite the state's argument to the contrary, simply because Lebel made the statement in the presence of Santos and others, that, without more, is insufficient to draw the inference that the statements in some way were designed to promote or facilitate achievement of the goals of the ongoing conspiracy. See, e.g., *United States* v. *LiCausi*, 167 F.3d 36, 50 (1st Cir.) (finding that statements of conspirator discussing crime were indicative that coconspirator was merely "blowing off steam or venting anxiety" and could not fairly be considered in furtherance of conspiracy), cert. denied sub nom. *Durfree* v. *United States*, 528 U.S. 827, 120 S. Ct. 79, 145 L. Ed. 2d 67 (1999); *Tuscaloosa* v. *Harcros Chemicals, Inc.*, 158 F.3d 548, 559 (11th Cir. 1998) ("statement that merely discloses the existence of a conspiracy to a non-conspirator, that merely 'spills the beans,' with no intention of recruiting [the nonconspirator] into the conspiracy does not further the conspiracy"), cert. denied, 528 U.S. 812, 120 S. Ct. 309, 145 L. Ed. 2d 42 (1999); *United States* v. *Lieberman*, 637 F.2d 95, 102 (2d Cir. 1980) (finding that statements of one conspirator did not qualify as being in furtherance of conspiracy because they occurred in "casual conversation," which made it "difficult to envision how it [the conversation] would have furthered the conspiracy").

indicative of conduct on his part, when the circumstances show that he heard, understood and comprehended the statement, and the facts are known to him and he had the opportunity to speak and the circumstances naturally called for a reply from him. . . . In other words, under such circumstances, and if no other explanation is equally consistent with [the defendant's] silence, the defendant's silence may be construed as an admission of guilt . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Pierre*, supra, 277 Conn. 72–73.

During the redirect examination of Santos, he testified specifically that the defendant was present during a conversation in an apartment when Lebel, in the presence of others, including the defendant, made statements that directly incriminated the defendant as being involved in the murder of Arnini. According to Santos, the defendant made no effort to correct Lebel, did not deny that the crime had occurred and said nothing in response. Thus, the record amply supports that a highly inculpatory statement was made within the defendant's hearing, that he understood and comprehended the statement, that he had the opportunity to speak and that the circumstances naturally called for a reply from him, yet he made no response. Under these circumstances, we conclude that the defendant's silence may be construed properly as an admission of guilt.

The crux of the defendant's argument against the admission of the statement as an adoptive admission rests on the availability of Lebel as a trial witness. Specifically, the defendant argues that because the court made no finding that Lebel was unavailable to testify, the evidence was inadmissible. Under our code of evidence, however, an adoptive admission is not excluded by the hearsay rule, *whether or not the declarant is available as a witness.* Conn. Code Evid. § 8-3 (1) (B). Thus, although such argument may have merit in the

context of Connecticut Code of Evidence § 8-6 hearsay exceptions such as a dual inculpatory statement,[13] it is irrelevant in the context of an adoptive admission, where no threshold finding of unavailability is required. See Conn. Code Evid. § 8-3 (1) (B).

Similarly, the defendant's argument that the admission of Lebel's statement violated his right to confrontation falters when analyzing the statement as an adoptive admission. In his confrontation clause argument, the defendant concedes that Lebel's statement was nontestimonial, thereby falling outside the ambit of *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Nevertheless, the defendant seeks to invoke traditional notions of confrontation, focusing on the reliability of the statement. See *State* v. *Slater*, 98 Conn. App. 288, 292, 908 A.2d 1097, ("[t]raditionally, for purposes of the confrontation clause, all hearsay statements were admissible if [1] the declarant was unavailable to testify, and [2] the statement bore adequate indicia of reliability" [internal quotation marks omitted]), cert. granted on other grounds, 280 Conn. 950, 912 A.2d 484 (2006).

A nontestimonial statement admitted properly as an adoptive admission does not raise confrontation issues. Here, the defendant adopted Lebel's statement as his own; thus, the lack of opportunity to cross-examine Lebel does not violate the confrontation clause. See *United States* v. *Allen*, 10 F.3d 405, 413–14 (7th Cir. 1993) ("[The] lack of opportunity to cross-examine the

---

[13] "A dual inculpatory statement is admissible as a statement against penal interest under § 8-6 (4) of the Connecticut Code of Evidence, which carves out an exception to the hearsay rule for an out-of-court statement made by an unavailable declarant if the statement at the time of its making . . . so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." (Internal quotation marks omitted.) *State* v. *Pierre*, supra, 277 Conn. 67.

declarant of a statement the defendant has adopted as his own does not violate the confrontation clause. . . . The reason for this is not difficult to understand. An adoptive admission is a statement that the defendant has adopted as his own. Thus the defendant himself is, in effect, the declarant. The witness against the defendant is the defendant himself, not the actual declarant; there is no violation of the defendant's right to confront the declarant because the defendant only has the right to confront the witnesses against him." [Citations omitted; internal quotation marks omitted.]); *United States* v. *Kehoe*, 310 F.3d 579, 591 (8th Cir. 2002) (same), cert. denied, 538 U.S. 1048, 123 S. Ct. 2112, 155 L. Ed. 2d 1089 (2003). Thus, because we conclude that Lebel's nontestimonial statement was admissible as an adoptive admission, the defendant's confrontation claim fails.

## III

## JURY INSTRUCTIONS

Finally, the defendant claims that the court improperly instructed the jury by referring to burglary in the third degree, robbery in the third degree and kidnapping in the second degree, which were predicate offenses for the charge of felony murder, as "simple" offenses. The defendant claims that the court's repeated use of the word "simple" to describe these offenses was legally incorrect because the court failed to state accurately the crimes as charged. The defendant also claims that the use of this term was highly likely to confuse the jury and reasonably misled the jury by trivializing the case. The defendant objected to the court's proposal to use this reference at trial, and the state concedes that the defendant adequately preserved the issue for appeal.

Our standard of review regarding properly preserved claims of improper jury instruction is well established.

"In reviewing claims of instructional error, we seek to determine whether it was . . . reasonably possible that the jury was misled by the trial court's instructions . . . [and] the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Martinez*, 278 Conn. 598, 608, 900 A.2d 485 (2006).

Here, it is undisputed that throughout its charge to the jury, the court repeatedly used the term "simple" to distinguish the degrees of the offenses of burglary, robbery and kidnapping and instructed the jury that to find the defendant guilty of felony murder, it must consider whether a "simple or nonaggravated burglary or robbery or kidnapping has occurred and has been proven beyond a reasonable doubt . . . ."[14] Throughout its charge, however, the court explained consistently to the jury that its use of the term "simple" was meant to distinguish the degrees of the offenses.

---

[14] As part of its charge on the felony murder count, the court instructed the jury as follows: "The defendant is charged with the crime of felony murder, in violation of [General Statutes §] 53a-54c of the Penal Code, which provides as follows: 'a person is guilty of murder when acting either alone or with one or more persons, he commits or attempts to commit—'

"Here, we have *simple robbery* or *simple burglary* or *simple kidnapping second,* what I call simple offenses—'and in the course and the furtherance of such crimes, or the flight therefrom, he or another participant, if any, causes the death of another person other than one of the participants.' " (Emphasis added.)

As the court explained in its instruction: "The degrees of a crime are determined by aggravating factors, which are additional elements which must be proven beyond a reasonable doubt besides the simple burglary or robbery or kidnapping elements. But for the felony murder count, you will consider whether a simple or nonaggravated burglary or robbery or kidnapping has occurred and has been proven beyond a reasonable doubt, and I will point the differences out . . . to you."

Subsequently, the court gave a detailed explanation of the elements of the charged offenses of burglary, robbery and kidnapping. In providing these instructions, the court distinguished the degrees of each crime, as charged, and explained the applicability of the predicate offenses as they related to the charge of felony murder. After providing a detailed explanation of the elements of the charged offense of robbery in the first degree, for example, the court explained the definition of what it described as "[s]imple robbery or robbery third." The court then explained, "[t]his, again, is simple or nonaggravated robbery that I am now giving you, and it is what is meant by robbery in the felony murder count." Thus, the court adequately explained to the jury that its description of the relevant offenses as "simple" offenses was synonymous with the relevant predicate offenses for the charge of felony murder, the elements of which, the court accurately described. Further, the court provided an accurate instruction on the state's burden of proof, which is not contested by the defendant.

In determining whether the court's use of "simple" to describe a nonaggravated offense to the jury was legally inaccurate, we find it compelling that our courts consistently have used the term "simple" to distinguish the degrees of criminal offenses that have aggravating elements. See, e.g., *State* v. *Wright*, 246 Conn. 132, 147,

716 A.2d 870 (1998) (explaining that unlike first or second degree robbery, "the force used or threatened in a typical *simple robbery* does not involve any sort of weapon, and is perpetrated by a single assailant" [emphasis added]); *State* v. *Ghere*, 201 Conn. 289, 295, 513 A.2d 1226 (1986) ("[s]imple robbery becomes robbery in the first degree if, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . uses or threatens the use of a dangerous instrument" [internal quotation marks omitted]); *State* v. *Owens*, 39 Conn. App. 45, 50–54, 663 A.2d 1108 ("After the trial court gave its instruction on the elements of *simple burglary*, it gave the following instruction on the elements constituting first degree burglary. . . . The trial judge [further] instructed the jurors that they could find the defendant guilty of first degree robbery if they found, in addition to elements of *simple robbery*, that the defendant was 'armed with a dangerous instrument.' " [Emphasis added.]), cert. denied, 235 Conn. 927, 667 A.2d 554 (1995). Here, the court's use of the term "simple" was merely a nontechnical way to distinguish the degrees of the charged offenses for the jury. As such, the court adapted the law to the issues properly and guided the jury in applying the law to the facts.

Thus, in considering the charge as a whole, we conclude that the court's instruction on felony murder, coupled with its specific instructions on the elements of burglary in the third degree, robbery in the third degree and kidnapping in the second degree, as well as its general instructions on the state's burden of proof, was legally correct and apprised the jury adequately of the necessary elements for the conviction of felony murder and the state's burden to prove that offense beyond a reasonable doubt. Accordingly, we conclude that there was no reasonable possibility that the jury misunderstood the court's instructions regarding the

elements necessary to find the defendant guilty of felony murder. We conclude that the court's instructions could not have misled the jury and, therefore, that the instructions were constitutionally adequate.

The judgments are affirmed.

In this opinion the other judges concurred.